**CORNELL VILLAGE TOWER CONDO-MINIUM, Harold R. Metcalf, Karlyn A. Metcalf, Imre G. Hidvegi, Denise F. Hidgevi, Thomas Roby, Mary Roby, David Z. Feuer, and Joyce H. Feuer, Plaintiffs,**

v.

**DEPARTMENT OF HOUSING AND UR-BAN DEVELOPMENT, Samuel Pierce, Secretary of Housing and Urban Development, and Gertrude Jordan, Regional Administrator of Chicago Area Housing and Urban Development Office, Defendants.**

No. 88 C 10099.

United States District Court,
N.D. Illinois, E.D.

Oct. 9, 1990.

912

Robert W. Fioretti, Donnie Rudd, Donnie Rudd & Associates, Schaumburg, Ill., Jerome Wiener, Glenn Sechen, Donnie Rudd & Associates, Chicago, Ill., for plaintiffs.

Anton Valukas, U.S. Atty., Gillum Ferguson, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Seeking to prevent the construction of a 21–story apartment building in their neighborhood, plaintiffs, a condominium association and several of its members (collectively "Cornell"), have filed this action against the United States Department of Housing and Urban Development and two of its officials (collectively "HUD"), alleging that HUD's decision to award this project a Housing Development Grant was arbitrary, capricious, and an abuse of discretion. Before this court is HUD's motion to dismiss or for summary judgment. For the following reasons, that motion is granted in part and denied in part.

## FACTS

The Housing Development Grant Program, authorized by § 17(d) of the U.S. Housing Act of 1937, 42 U.S.C. § 1437o (d) (1988), provides federal funds for the rehabilitation and development of privately owned property that will be used for primarily residential rental purposes and that is located in areas experiencing severe rental housing shortages. To be eligible for a grant under this program, a developer must reserve at least 20 percent of the project's units for lower income families. The Secretary of Housing and Urban Development has awarded a Housing Development Grant to the City of Chicago ("the City") for the development of the Park Tower Apartment building, the project at issue here, and Cornell is attempting, through this suit, to enjoin the release of funds. In its two-count complaint, Cornell points to several violations of HUD regulations that allegedly render HUD's decision to award the grant "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (1988). Count I asserts that HUD failed to ensure that the City's application met two of the threshold requirements set forth in 24 C.F.R. § 850.37, and Count II claims that HUD's erred in accepting the City's finding that the project would have no significant impact on the environment. We consider these allegations in turn.

## DISCUSSION

A. *Count I: HUD's Threshold Requirements for Housing Development Grant Applications*

Pursuant to the Housing Development Grant Program of the United States Housing Act of 1937, 42 U.S.C. § 1437o (1988), the Department of Housing and Urban Development has promulgated a series of regulations that sets forth the eligibility and application requirements and award procedures for Housing Development Grants. 24 C.F.R. Pt. 850 (1989). These regulations require, as part of the application procedure, that a potential grantee fulfill certain threshold requirements before an application will be considered by HUD. 24 C.F.R. § 850.37. According to Cornell, HUD's initial approval and subsequent failure to rescind the grant in this case violates two of § 850.37's threshold requirements: § 850.37(i), which forbids consideration of applications where the applicant is not able to ensure that "the project will be started within 24 months of notice of HUD preliminary funding approval and will be completed in a timely manner"; and § 850.37(m), which limits consideration to those applications "determined not to have a negative effect on neighborhood development or cause undue relocation hardship."

### 1. Sovereign Immunity

■ In urging dismissal of Count I of Cornell's complaint, HUD asserts that judicial review of the alleged violations of § 850.37 is barred by sovereign immunity, arguing that agency action taken pursuant to these regulations is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and that as a result, the waiver of sovereign immunity found in the Administrative Procedure Act does not extend to the allegations in Count I. Cornell, in turn, points to 42 U.S.C. § 1404a (1988) as an alternative waiver of sovereign immunity; that section provides, *inter alia:*

> The Secretary of Housing and Urban Development may sue and be sued only with respect to its functions under the United States Housing Act of 1937, as amended [42 U.S.C. 1437 et seq.], and title II of Public Law 671, Seventy-sixth Congress, approved June 28, 1940, as amended [42 U.S.C. 1501 et seq.].

HUD attempts to disclaim the applicability of § 1404a by arguing that Cornell has asserted a violation of regulation rather than of statute, and therefore only the APA can provide the waiver of sovereign immunity necessary to permit review of the alleged violations. This argument, however, misconstrues the nature and applicability of the Administrative Procedure Act. The APA broadly subjects agency action of all kind to judicial review; it is not restricted to action claimed to transgress an agency regulation. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (APA invoked to review an alleged violation of § 4(f) of the Department of Transportation Act of 1966). Similarly, judicial review of regulatory irregularities is available under non-APA auspices. *See, e.g., Grant v. Schweiker,* 699 F.2d 189 (4th Cir.1983) (review of alleged violation of a Social Security Regulation pursuant to § 405 of the Social Security Act). Review in this case, then, could be predicated on a sovereign immunity waiver found in § 1404a. And that section, which applies to suits relating to the functions of the Secretary of Housing and Urban Development under, *inter alia,* the Housing Act of 1937, does appear to extend to an action for equitable damages alleging a violation of a regulation promulgated by HUD to implement § 17 of this Act. *See United States v. Yonkers Board of Education,* 594 F.Supp. 466, 470 (S.D.N.Y.1984) (§ 1404a waives sovereign immunity "for claims alleging direct violations by HUD of the substantive provisions of the Housing Acts"); *Little Earth of United Tribes, Inc. v. United States Dep't of Housing & Urban Dev.,* 584 F.Supp. 1292, 1299 (D.Minn. 1983); *cf. Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) (quoting U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947)) (suggesting that substantive regulations issued pursuant to statutory authority are part of the statutory scheme and " 'have the force and effect of law' ").[1]

That sovereign immunity may be waived by a non-APA provision, however, does not mean that the exceptions to judicial review contained in the APA can be ignored. Section 701(a) of the APA excludes judicial review of agency action in two situations: where a statute precludes review and where agency action is committed to agency discretion by law. 5 U.S.C. § 701(a). These limitations on review do not represent, as HUD and Cornell seem to think, exceptions to the APA's comprehensive waiver of sovereign immunity contained in § 702; rather, they constitute distinct inquiries that therefore must be pursued even in the presence of an alternative waiver. *See* Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion",* 82 Harv.L.Rev. 367, 368–69; *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 873–74 (D.C.Cir. 1970).[2]

---

1. Sovereign immunity in this case, which does not seek monetary damages of any kind, is also categorically waived by the Administrative Procedure Act. *See* 5 U.S.C. § 702.

2. Although there is usually no harm in incorporating the § 701(a) inquiries in a sovereign immunity analysis, as indeed some courts have, *see* Saferstein, *supra,* at 369, it is necessary to distinguish these two doctrines in cases where a

HUD does not assert, nor do we believe, that Congress intended to preclude review of agency action in this area;[3] indeed, § 1404a indicates a clear intent to make HUD's actions under the Housing Act of 1937 reviewable. Instead, HUD's argument focuses on the second prong of § 701(a), claiming that the agency action at issue is nonreviewable because of its discretionary nature. Although frequently discussed, this exception is quite narrow in scope; the Supreme Court, in its first exploration of this doctrine, announced that § 701(a)(2) precluded review only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 820 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945) (legislative history of the Administrative Procedure Act)). Though criticized, *see Cardoza v. Commodity Futures Trading Commission*, 768 F.2d 1542, 1548–49 & n. 5 (7th Cir.1985), the "no law to apply" standard appears to enjoy continued vitality. *See Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); *Turner v. United States Parole Commission*, 810 F.2d 612, 614 (7th Cir.1987) ("judicial review will ... be presumed unless the statutory scheme provides no meaningful guideline by which to define the limits of the agency's discretion"); *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C.Cir.1985). Where agency action is of a sort that is inherently unsuitable for judicial review, a presumption of nonreviewability is imposed, which can be defeated by a showing that Congress intended to circumscribe agency discretion by "provid[ing] meaningful standards for defining the limits of that discre-

tion." *Heckler*, 470 U.S. at 834, 105 S.Ct. at 1657; *Cardoza*, 768 F.2d at 1549; *Robbins*, 780 F.2d at 44. This requirement necessarily imposes a greater burden on the party seeking review than the test for presumptively reviewable cases even though the two standards seem to be drawn in similar terms. *Cf. Robbins*, 780 F.2d at 44–45 (referring to a "heightened degree of discernible standards" required to overcome the presumption of nonreviewability).

The category of cases that are deemed inherently unsuitable for judicial review is very narrow, *see Cardoza*, 768 F.2d at 1549, and only encompasses those areas of agency action in which courts are not qualified to determine whether an agency has abused its discretion, such as "State Department action in foreign affairs, ... Federal Reserve Board decisions setting interest rates" and agency refusal to take enforcement measures. *Id.* HUD's decision to award Housing Development Grants cannot be analogized to any of the situations in this narrow category of presumptively nonreviewable action. We are left, then, to inquire whether the more relaxed standard applicable to presumptively reviewable cases serves to bar judicial review of HUD's actions in this case. We conclude that it does not.

In discerning whether a statutory scheme provides sufficient law for a reviewing court to apply, two factors must be considered. *See* Sunstein, *Reviewing Agency Inaction After Heckler v. Chaney*, 52 U.Chi.L.Rev. 653, 658 (1985). The first focuses on the statute at issue and as such relates to congressional intent. *See Safer-*

---

party attempts to dispose of the sovereign immunity issue by pointing to an alternative statutory waiver; such a practice would improperly allow the § 701(a) exceptions to be circumvented.

**3.** In its response to HUD's "sovereign immunity" argument, Cornell cites a three-factor test laid out in *Davis Associates, Inc. v. Secretary, Dep't of Housing & Urban Dev.*, 498 F.2d 385 (1st Cir. 1974), and designed to discern whether "Congress intended to preclude review." 498 F.2d at 390. Although *Davis* seems to merge the two § 701(a) exceptions into one inquiry, the Supreme Court has made clear that they are dis-

tinct. *See Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1983). Alternatively, the *Davis* three-pronged test might be interpreted as corresponding to the statutory preclusion exception because of the emphasis on Congress's intent, but the authority cited by *Davis* in support of the test indicates that it in fact speaks to the agency discretion exception. *See Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir.1970). We assume that Cornell—and HUD, in its reply brief—similarly invoked *Davis's* three-part test with respect to the agency discretion issue.

stein, *supra* p. 5, at 371 ("Courts properly applying the doctrine [of "committed to agency discretion"] try to discern whether Congress intended review of the particular agency determination at issue."). The second factor looks to the actual allegations of the plaintiff to determine whether the statutes or regulations cited provide meaningful standards on which to base judicial evaluation. *See* Sunstein, *supra*, at 658–69; Saferstein, *supra* p. 5, at 395; *Robbins*, 780 F.2d at 47.

The regulatory provisions at issue in this case were promulgated pursuant to § 17 of the U.S. Housing Act of 1937, which authorizes the Secretary of HUD, *inter alia*, "to make development grants for new construction or substantial rehabilitation ... of real property to be used primarily for residential rental purposes." 42 U.S.C. § 1437*o* (a)(1)(B), (d)(1). The statute proceeds to specify the general criteria for area eligibility, the requirements for actual grant recipients, the information to be included in applications for grants, and the factors to be considered by the Secretary of HUD in selecting grant recipients. While the individual provisions of the statute seem to be quite focused and specific, collectively they reflect a general sense of the overriding purpose of the development grant program: to redress the severe shortage of decent rental housing in those areas—especially large cities—where availability is limited. *See* 42 U.S.C. § 1437*o*(d)(2) (to qualify for grant, project must be "located in an area that is experiencing a severe shortage of decent rental housing opportunities for families and individuals without other reasonable and affordable housing alternatives in the private market"), (d)(5)(A), (d)(6)(B), (d)(9). Three secondary concerns also emerge: a desire to ensure a certain level of construction or rehabilitation aimed at lower income families, *see* 42 U.S.C. § 1437*o*(d)(4)(C), (d)(4)(E), (d)(6)(A), to promote the development of housing at the least cost to the federal government, *see* 42 U.S.C. § 1437*o*(d)(4)(B), (d)(5)(E), and to minimize the disruption of existing neighborhoods. *See* 42 U.S.C. § 1437*o*(d)(3)(D), (d)(5)(C). It is true that § 17 allows the Secretary some discretion

in determining whether to select a project for a grant, for the statute provides that the Secretary shall make selections "on the basis of the extent" of fulfillment of eight criteria, 42 U.S.C. § 1437*o*(d)(5), without explicitly dictating the relative importance of each criteria. But Congress does direct the Secretary to give priority to projects that exceed the statutory minimum percentage of units reserved to low-income tenants and those that are located in areas experiencing profound housing shortages. 42 U.S.C. § 1437*o*(d)(6). And the underlying goals of the program offer further guidance to a court reviewing alleged arbitrary action of the Secretary. As a general matter, then, the governing statute in this case clearly provides "law to apply."

The second factor to be considered in determining whether there is law to apply requires us to look to Cornell's actual allegations. Cornell asserts a violation of two regulations, the first prohibiting HUD from considering applications unless it is assured of a timely project start and completion, and the second requiring HUD to make a threshold determination that a project will not have a negative effect on neighborhood development or cause undue relocation hardship. These regulations in turn correspond to specific provisions in the authorizing statute requiring rental development programs assisted under § 17 to provide that "the grantee must commence construction or substantial rehabilitation activities not later than 24 months after notice of project selection," 42 U.S.C. § 1437*o*(d)(4)(G), and directing the Secretary to consider the effect of the proposal on neighborhood development before selecting a project for assistance. 42 U.S.C. § 1437*o*(d)(5)(C). The statute additionally requires the Secretary to consider the applicant's record of performance in meeting housing needs and his capacity to complete the project in a timely manner.

■ We find there to be little doubt that the provisions relating to the timely commencement of projects receiving grants under this program provide sufficient guidelines for a court to determine whether agency action taken pursuant to them was

arbitrary and capricious. To be sure, ascertaining the applicant's capacity to assure the Secretary of his ability to start and complete the project in a timely manner is not a purely objective undertaking, but the regulation setting forth this threshold requirement certainly does not afford the Secretary the sort of unbridled discretion that would render his action nonreviewable. A reviewing court need not determine whether the Secretary's decision to consider or not to consider an application was *correct* but rather whether it was arbitrary, capricious, or an abuse of discretion. That a statute or regulation affords an agency some discretion does not mean that agency action taken pursuant to that provision is committed to agency discretion by law.

■ With respect to the neighborhood development provisions, HUD argues that the term "neighborhood development" encompasses "a variety of competing policy considerations, none of them assigned priority or numerical weight by regulation or statute" (HUD's memorandum at 8). Even assuming that § 17 and HUD's regulation do not provide sufficient guidance to a reviewing court, HUD has devised a Housing Development Grant checklist distributed to reviewers charged with evaluating the effect of the proposed project on neighborhood development. This checklist, which reflects HUD's interpretation of "neighborhood development" and of 24 C.F.R. § 850.37(m) and as such "provide[s] a basis for judicial review," *see Robbins*, 780 F.2d at 45, requires HUD reviewers to consider the project's physical compatibility with neighborhood structures; compatibility with existing land uses; increased demand on traffic and other environmental burdens; complementary effects on employment patterns; and likely effect on recent changes in neighborhood character and investment patterns. These factors limit the concept of "neighborhood development" and accordingly fetter agency discretion

while providing guidelines for judicial evaluation. *See Cardoza*, 768 F.2d at 1550 (agency regulation listing six factors that an agency *could* consider, including "[a]ny other factors which the Commission deems relevant," found to limit the potential for discretion). Moreover, Cornell has alleged in its complaint that HUD failed to consider *any* of the neighborhood development factors (Complaint ¶ 29), and this court has ample guidelines to evaluate that claim. Based on the governing statute and the underlying regulations relating to the alleged violations in this case, therefore, we cannot conclude that judicial review is precluded under the APA.

### 2. 24 C.F.R. § 850.37(i)

#### a. *Standing*

■ HUD raises an additional jurisdictional argument with respect to Cornell's claim that HUD violated the threshold regulation requiring that applicants assure HUD of their ability to begin a project within 24 months of approval, 24 C.F.R. § 850.37(i). Cornell lacks standing to complain of this violation, HUD asserts, because it has not suffered a cognizable injury as a result of the agency's allegedly illegal action. As a matter of constitutional law, no litigant has standing to challenge agency action unless he fulfills Article III's "case or controversy" requirement by alleging that "the challenged action has caused him injury in fact, economic or otherwise." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). In addition to satisfying this constitutional concern, a litigant hoping to challenge agency action must fulfill the requirements imposed by the Administrative Procedure Act, 5 U.S.C. § 702. *See Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *Milwaukee v. Block*, 823 F.2d 1158 (7th Cir.1987).[4]

---

**4.** In developing this argument, HUD seems to conflate the constitutional and prudential components of the standing doctrine. Although some commentators have criticized the bipartite approach to standing problems, *see* B. Schwartz,

*Administrative Law* 470–71 (2d ed. 1984); 4 K. Davis, *Administrative Law Treatise* 223 (2d ed. 1983), the Supreme Court and the Seventh Circuit continue to adhere to this analytical technique. *See Clarke*, 479 U.S. 388, 107 S.Ct. 750,

To surmount the constitutional hurdle, a plaintiff first must allege a " 'distinct and palpable injury.' " *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). Although this injury need not be unique to the complainant, *see United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686–87, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973); *South East Lake View Neighbors v. Dep't of Housing & Urban Dev.*, 685 F.2d 1027, 1035 (7th Cir.1982), a generalized and abstract grievance common to all citizens, such as the interest in ensuring compliance with a constitutional provision, does not rise to the level of injury-in-fact. *See Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). The sphere of cognizable injuries is not limited to those affecting the financial interest of the plaintiff; aesthetic and environmental values may equally provide a basis for standing under Article III. *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Data Processing*, 397 U.S. at 154, 90 S.Ct. at 830.

In addition to a showing of injury, a litigant hoping to satisfy the Article III requirement must allege a " 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power*, 438 U.S. at 72, 98 S.Ct. at 2630 (quoting *Arlington Heights v. Metropoli-*

*tan Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977)).[5] Cornell alleges in its complaint that each of the individually named plaintiffs and the condominium association will suffer injuries as a result of the high-rise project to be developed under HUD's auspices. Specifically, Cornell complains that the project will cause increased population density, traffic and parking congestion, environmental (air and noise) pollution, and loss and diminution in their property value, all of which will affect the plaintiffs' health, safety, and well-being. This harm, Cornell claims, "has been and will be caused by the federal commitment to and support of the development and construction of the Park Tower Apartments project" (Complaint ¶ 23). These allegations appear to this court to be sufficient to confer Article III standing. *See Alschuler v. Dep't of Housing & Urban Dev.*, 686 F.2d 472, 476–77 (7th Cir.1982) (Article III satisfied where HUD approval of housing assistance payments was alleged to "cause substantial harm to [plaintiffs'] neighborhood by creating an imbalance in the minority and low-income population, breeding an increase in crime, and placing an added strain on community resources" and by adversely affecting the environmental, recreational, cultural, historical, and aesthetic qualities of the neighborhood); *cf. South East Lake View*, 685 F.2d at 1034–35 (allegations of increases in traffic and parking congestion, noise and air pollution, and population density and violent crime "clearly satisfy the injury in fact test");[6] *Kirby v. United States*

93 L.Ed.2d 757; *Milwaukee*, 823 F.2d 1158; *People's Gas, Light & Coke Co. v. United States Postal Service*, 658 F.2d 1182 (7th Cir.1981).

5. The Seventh Circuit appears to add a third element to the Article III standing test: a complainant must demonstrate, in addition to injury-in-fact and causal connection, that "the alleged injury 'is likely to be redressed by a favorable decision.' " *City of Milwaukee*, 823 F.2d at 1164 (quoting *Simon v. Kentucky Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976)). But in *Duke Power*, the Supreme Court mentions this redressibility factor not as an additional consideration but as an alternative construction of the causal connection requirement. 438 U.S. at 74, 98 S.Ct. at 2631. Indeed, other High Court authority does

not discuss redressibility at all. *See Data Processing*, 397 U.S. 150, 90 S.Ct. 827. To the extent these inquiries are separate, it is because it does not always follow from a finding of redressibility that there is a sufficient causal connection between the agency action and the injuries alleged. *See Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984).

6. In *South East Lake View*, however, the Seventh Circuit ultimately found the plaintiffs to lack standing to contest HUD's funding decision (to subsidize rents for prospective tenants of the building at issue and to guarantee the building's mortgage) because of an insufficient causal connection between this decision and the plaintiffs' injuries. The court in that case held that enjoin-

*Government, Dep't of Housing & Urban Dev.*, 675 F.2d 60, 65 (3d Cir.1982); *Lower Moreland Homeowner's Ass'n v. Dep't of Housing & Urban Dev.*, 479 F.Supp. 886, 896 (E.D.Pa.1979). HUD attempts to dispute the causal link between the asserted injury and the agency action in this case by arguing that Cornell's injury is not "fairly traceable to the hypothetical delay in the start of construction" (HUD's Memorandum at 5). *Duke Power* establishes quite clearly, however, that a litigant need not demonstrate a nexus between the injury claimed and the precise violation asserted unless he is relying on his taxpayer status in bringing the suit. 438 U.S. at 78–79, 98 S.Ct. at 2633–34 (Article III satisfied even though environmental and health injuries claimed to result from the existence of nuclear reactor not directly related to the alleged constitutional infirmity of the Price–Anderson Act).

■ Having survived the Article III test, Cornell presumptively has standing under the APA to challenge HUD's action in this case. *See Milwaukee*, 823 F.2d at 1167. This presumption can be overcome, however, by a showing that Congress did not intend plaintiffs like Cornell to bring this sort of suit.[7] *See Clarke*, 479 U.S. at 394, 107 S.Ct. at 754 (1987). In interpreting congressional intent, a court begins with an inquiry into the zones of interests established by the relevant statute. This "zone of interest" test is designed to weed out plaintiffs whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* To satisfy this test, a complainant must show that he "is asserting some interest that has a 'plausible relationship' to at least one of the concerns that actually motivated Congress to take legislative action." *Milwaukee*, 823 F.2d at 1166 (quoting *Clarke*, 479 U.S. at 403, 107 S.Ct. at 759).

■ HUD maintains that Cornell fails the zone-of-interest test because the intended beneficiaries of 24 C.F.R. § 850.37(i) are primarily HUD itself and secondarily, possibly, prospective tenants of the projects and grant bidders but certainly not neighbors whose only connection to the project is geographical proximity. This approach to the zone-of-interest inquiry is unduly restrictive, however, and does not comport with the Supreme Court's pronouncement in *Clarke*. The zone-of-interest test, *Clarke* teaches, "is not meant to be especially demanding," 479 U.S. at 399, 107 S.Ct. at 757, and the "relevant statute" language of APA § 702, *see supra* note 7, is interpreted broadly. Courts applying this test are not limited to considering the actual statute under which the plaintiff has brought the suit but can look also to any provision of related legislation as evidence of Congress's overall purposes in taking legislative action, *see Clarke*, 479 U.S. at 401, 107 S.Ct. at 758, and as long as the plaintiff can show a plausible relationship to at least one of these purposes, he falls within the zone of interest. *See Milwaukee*, 823 F.2d at 1166. The Seventh Circuit's approach in *Alschuler*, 686 F.2d at 477, which HUD cites and which arguably supports HUD's narrow conception of the zone-of-interest test, was deemed in *Milwaukee* to be too restrictive in light of the Supreme Court's *Clarke* decision. *See Milwaukee*, 823 F.2d at 1165.[8] Older Supreme

---

ing federal assistance would not redress the alleged injuries because private financing offers and free-market rental rates suggested that the completed building would be occupied "with or without federal financing." 685 F.2d at 1037–38. By contrast, HUD does not argue in this case that the alleged injuries will occur even if this court decides to enjoin the Park Tower Apartment project.

7. This requirement is derived from § 702 of the APA, which displaces the usual prudential limits on standing. *See Milwaukee*, 823 F.2d at 1165. Section 10 provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by action within the meaning of a relevant statute, is entitled to judicial review thereof.
5 U.S.C. § 702.

8. The same reasoning used by the Seventh Circuit in *Alschuler* was invoked by the Southern District of Florida in *Allapattah Community Association v. Landrieu*, 502 F.Supp. 436 (S.D.Fla. 1980), the other case that HUD relies on in support of its position. *Clarke* and *City of Milwaukee*, then, discredit this authority as well.

Court precedent also undermines HUD's position. *See Duke Power*, 438 U.S. at 80, 98 S.Ct. at 2634 (rejecting requirement of a connection between "the claimed injury and the right asserted" outside the context of third-party standing); *Atlanta Gas Light Co. v. U.S. Department of Energy*, 666 F.2d 1359, 1368 n. 16 (11th Cir.), *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 78 (1982) (applying *Duke Power* to allow private plaintiff to raise 10th amendment claim even though 10th amendment protects the interests of the states); K. Davis, *supra* note 4, at 260–67 (discussing Supreme Court's treatment of third-party standing when third party is already properly before the court).

▪ In applying the zone-of-interest test, then, we need not determine that the interests of Cornell fall within the zone of interest of the threshold regulation that it claims was violated or even of the underlying statutory provision requirement that construction begin within 24 months after notice of project selection. Rather, Cornell will satisfy the zone-of-interest test as long as its interest coincides with any of Congress's purposes in enacting the National Housing Act of 1937.[9] As the discussion of APA § 701(a), *supra*, makes clear, one of these purposes is to promote new construction and substantial rehabilitation while minimizing the disruption of neighborhoods. Indeed, that HUD does not raise a standing challenge with respect to Cornell's claim that HUD violated a regulation relating to the project's expected neighborhood impact indicates that HUD concedes a relationship between Cornell's interest in this area and a purpose of the Housing Act. In these circumstances, we find Cornell's asserted interests to fulfill the zone-of-interest requirement.

The standing inquiry does not end here, however; Cornell still might be denied review if other indicia of congressional intent suggest that "Congress intended to preclude the plaintiff from suing." *Milwaukee*, 823 F.2d at 1166; *Clarke*, 479 U.S. at 400, 107 S.Ct. at 757. Neither party adduces any evidence of congressional intent or even addresses this component of the standing inquiry, and we are inclined to rule that Congress did not intend to preclude this sort of suit. We need not resolve this issue definitively, however, for Cornell's claim is transparently nonmeritorious.

#### b. *Merits*

▪ A comparison of the violation that Cornell alleges in its complaint with the text of 24 C.F.R. § 850.37(i) demonstrates unequivocally that Cornell has failed to state a claim based on this regulation. The regulation that Cornell apparently is arguing was violated imposes on HUD only a threshold obligation to determine, before considering an application, that "[t]he applicant has the capacity to assure that the project will be started within 24 months of notice of HUD preliminary funding approval and will be completed in a timely manner." And Cornell's prayer for relief presupposes a violation of this threshold requirement; Cornell urges this court to "declare that the *approval* of the funding was arbitrary, capricious and an abuse of discretion not otherwise in accordance with the law" (Complaint at 9) (emphasis added). Yet as evidence of a violation, Cornell merely offers that "[a]s of September 29, 1988, the developer of this project failed to begin construction of the project within twenty-four (24) months of notice of the HUD preliminary funding approval" (Complaint ¶ 28). Section 850.37(i), however, imposes no continuing duty of timeliness on the applicant nor obligation on HUD to rescind funds if the project falls behind schedule; it speaks only to the prospects for timely construction at the time the application is made. Cornell does not allege that HUD accepted this application or approved the grant without considering the applicant's capacity to begin the project within 24 months or that the circumstances precluded HUD from considering the appli-

---

9. A mere coincidence of interest is all that is necessary; the Supreme Court declared categorically in *Clarke* that "there need be no indication of congressional purpose to benefit the would-be plaintiff." 479 U.S. at 399–400, 107 S.Ct. at 757 (citing *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971)).

cation. In defense ·of this claim, Cornell insists that § 850.37(i) must be interpreted in light of another regulation, which requires HUD to include a development schedule in its grant agreement. This regulation, 24 C.F.R. § 850.61(a)(2) (1989), although perhaps related to § 850.37(i), has no bearing on the latter's substantive requirements. Cornell cannot salvage this claim by pointing to other provisions that may have been violated; complaint-amending mechanisms have been established for that purpose.

### 3. 24 C.F.R. § 850.37(m)

▮▮▮ HUD does not dispute Cornell's standing to seek review in this court of the alleged violation of .24 C.F.R. § 850.37(m) but rather attacks this claim solely on the merits, asking this court to dismiss, and alternatively to grant summary judgment on, this portion of Count I. In support of its motion for dismissal, HUD argues that the regulation at issue cannot be interpreted as protecting the interests cited by Cornell in its complaint, such as increased population density, because these concerns are "necessary side-effect[s] of any new residential development" and "inescapable consequence[s] of living in the city" (HUD's memorandum at 9), and agency consideration of these concerns would frustrate the central purpose of increasing the supply of decent rental housing.

We do not find this argument persuasive. Although a certain amount of traffic, congestion, and population density is a necessary by-product of urban living, certainly not all construction affects these variables to the same extent, and consideration of these factors when reviewing applications for Housing Development Grants does not mean that no grants will ever be awarded. Indeed, HUD's own interpretation of § 850.37(m) mandates an evaluation of the effect of a proposal on these concerns: as discussed *supra*, HUD has developed a Housing Development Grant checklist, which it distributes to the reviewers who are to determine whether an application

meets the threshold requirements of 24 C.F.R. § 850.37 (Sworn Declaration of Mary Anderson ¶ 7). HUD's standards for the assessment of an application's projected effect on the physical and economic development of the affected neighborhood, as indicated by this checklist, include the "increased demand on traffic and other environmental burdens." Cornell explicitly alleges in its complaint that HUD failed to consider this factor in making its threshold evaluation (Complaint ¶ 29), and this allegation alone is sufficient to state a claim under § 850.37(m). Moreover, Cornell continues in ¶ 30 of its complaint to allege that the Park Tower project is, by virtue of its site, "detrimental to family health" and "does not meet the neighborhood's [sic] standards set forth in" § 850.37(m). We interpret this assertion as well to refer to the criteria set forth in HUD's Housing Development Grant checklist, and it bolsters Cornell's claim under § 850.37(m).

HUD's request for summary judgment on this claim raises more difficult questions. Cornell alleges initially in its complaint that HUD neglected entirely to make a threshold determination of the effect of the project on neighborhood development (Complaint ¶ 29). Standing alone, this allegation does not suffice to defeat HUD's motion for summary judgment, for the sworn declaration of Mary Anderson, the Chief of the Multi–Family Housing Program Branch of the Chicago Regional Office of HUD, indicates that four separate reviewers conducted this threshold evaluation, and exhibits 5–8, attached to HUD's memorandum of law, corroborate this statement.

▮▮▮ Cornell's complaint asserts alternatively that HUD made the threshold neighborhood development determination but that this determination was made improperly and that, accordingly, the processing and approval of the application was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[10] (Complaint ¶ 30). This allegation

---

10. Because HUD's action in awarding Housing Development Grants amounts to informal agency adjudication, for it is not based on a public adjudicatory hearing, *see Overton Park,* 401 U.S.

requires a more searching analysis. Review under the arbitrary and capricious standard requires a court to determine "whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824; *United States v. an Article of Device*, 768 F.2d 826, 830 (7th Cir.1985). Apparently speaking to the relevant factors component of this test, Cornell contends that the effect of the proposal on the neighborhood could not have been properly evaluated because the determination was made without the benefit of the City's environmental assessment, which was not available at the time of HUD's threshold decision. We do not agree that a thorough § 850.37(m) evaluation requires scrutiny of the environmental assessment. HUD's Housing Development Grant review checklist for this threshold determination establishes specific criteria that reviewers must evaluate when making this determination; absent from this checklist is any requirement or suggestion that the reviewer consider the grantee's environmental assessment. The checklist also indicates that the reviewer's evaluation of the effect of the project should be based on information supplied in specific parts of the application and on the reviewer's own knowledge but again neglects to refer the reviewer to the environmental assessment that corresponds to the application.

Nor does logic impel consideration of the environmental assessment by the threshold reviewer. The focus of the inquiry under § 850.37(m), which targets neighborhood development, appears to be much more narrowly drawn than that of the environmental assessment, which comprehends a broad range of environmental factors relating to the protection, restoration, and enhancement of environmental quality and appears to be only marginally related to neighborhood development. *See* 24 C.F.R. § 58.3 (1989); 42 U.S.C. § 4321 (1988) (congres-

sional declaration of purpose of NEPA). Most significantly, the actual environmental assessment, which is prepared by the grantee, is not required to be submitted with the application; HUD regulations call only for the "applicant's environmental assessment *finding*." 24 C.F.R. § 850.33(m) (1989) (emphasis added). In this case, in accordance with HUD regulations, the environmental assessment resulted in a "finding of no significant impact" ("FONSI"), which was submitted with the application. This finding, which must be accepted by HUD unless marked by procedural defect, *see Dickeyville Ass'n v. U.S. Dep't of Housing & Urban Dev.*, 636 F.Supp. 362, 366–67 (D.Md.1986), could have been of little use to threshold reviewers in evaluating the effect of a project on neighborhood development. In promulgating § 850.37(m), HUD clearly must have realized that an applicant's environmental assessment would frequently be represented only by a FONSI and contemplated that the threshold determination of effect on neighborhood development would turn on other evidence, such as the applicant's assessment of the neighborhood development effect, which is required by 24 C.F.R. § 850.33(n) (1989). That HUD may have acted improperly in accepting the City's FONSI under NEPA guidelines, as Count II asserts, does not impugn the correctness of the § 850.37(m) determination, for the FONSI and the underlying environmental assessment appear to be quite unrelated to this threshold evaluation.

■■ Cornell asserts additionally that the grant award was arbitrary and capricious because the Park Tower project does not meet the standards set forth in § 850.37(m) for neighborhood development. A reviewing court is not permitted "to substitute its judgment for that of the agency," *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823, but can set aside agency ac-

---

at 414, 91 S.Ct. at 822, this action must be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988); *see Overton Park*, 401 U.S. at 414–415, 91 S.Ct. at 822–823; *United States v. An Article of Device*

*... Diapulse*, 768 F.2d 826, 829 (7th Cir.1985) ("*An Article of Device*"). Although neither party specifically addresses the issue of the proper standard for judicial review in this case, then, the standard implicitly urged in Cornell's complaint is in fact controlling.

tion that reflects a "clear error of judgment." Cornell does not develop this allegation with any detail in its memorandum in opposition to HUD's motions, and it does not indicate why it believes the determination was wrong, but it does observe that one of the four HUD reviewers was unable to determine what effect the Park Tower project would have on neighborhood development because of insufficient information on the application. The three remaining reviewers all concluded that the project would positively affect neighborhood development. The clear majority of reviewers, then, found not only that the project would not have a negative effect on neighborhood development (which is all that § 850.37(m) requires) but that it would actually inure to the benefit of the area. Weighing against this endorsement is one dissenting voice maintaining not that the project would have a negative effect but that the effect was not determinable. We cannot conclude that HUD's acceptance of these reports in fulfillment of the requirements of § 850.37(m) constitutes a "clear error of judgment." Accordingly, we grant HUD's motion for summary judgment with respect to this regulation.

## B. *Count II: National Environmental Policy Act*

By statute, Housing Development Grants awarded under § 17 of the Housing Act of 1937, such as the grant at issue in this case, are subject to the environmental protection measures of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.* ("HCDA") (1988). *See* 42 U.S.C. § 1437*o*(i)(2). Environmental protection under the HCDA is informed by the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* ("NEPA") (1988), *see* 42 U.S.C. § 5304(g), and, pursuant to statutory authority, HUD has promulgated a regulatory scheme to ensure that the policies of NEPA are effectively implemented. *See* 24 C.F.R. Pt. 58 (1989). Through these regulations, HUD has delegated to grant recipients "the responsibili-

ties for environmental review, decisionmaking, and other action that would otherwise apply to HUD under NEPA." 24 C.F.R. § 58.4(b) (1989). This environmental review process entails, except for exempt and categorically excluded projects, the preparation of an environmental assessment ("EA"), which leads to a finding of no significant impact ("FONSI") or a finding of significant impact on the environment. *See* 24 C.F.R. § 58.36, 58.41 (1989). If a recipient determines that the project will not significantly affect the environment, no environmental impact statement ("EIS") is required. *See Dickeyville,* 636 F.Supp. at 365. In Count II, Cornell alleges that HUD acted arbitrarily and capriciously in accepting and adopting the City of Chicago's environmental assessment finding of no significant impact on the environment.

### 1. Exhaustion

■■■ Seeking dismissal of the NEPA claim, HUD argues that Cornell has failed to avail itself of administrative procedures for objecting to the release of funds and, in light of the doctrine of exhaustion, cannot now be heard to raise its complaint in federal court. It is a well-established principle of administrative law that a complainant is not "entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938). This requirement of administrative exhaustion, however, presupposes a "prescribed administrative remedy"; where none is prescribed, direct petition to a federal court for judicial review is permissible. *See Davis v. United States Dep't of Housing & Urban Dev.,* 627 F.2d 942, 945 (9th Cir.1980).

■■■ In arguing that exhaustion was required in this case, HUD directs us to 24 C.F.R. Pt. 58, Subpt. J, which sets forth the requirements for the release of funds following HCDA's environmental review procedures.[11] We are not persuaded that

---

**11.** HUD implies that the remedy procedures contained in Subpart J represent only part of

the administrative procedures that must be exhausted before resorting to federal court. But

these regulations constitute a prescribed administrative remedy that Cornell failed to exhaust. Section 58.73 of this subpart provides that HUD, upon receiving a request for the release of funds ("RROF") following environmental review, shall wait 15 days before approving the release; during this period,

> [a]ny person or agency may object to a recipient's RROF and the related certification. However, the objections must meet the conditions and procedures set forth in this subpart. HUD ... can refuse the RROF and certification on any grounds set forth in § 58.75.

24 C.F.R. § 58.73 (1989). Unless the grant requester specifies a longer period in its published notice of intent to request a release of funds, however, HUD will only entertain objections that are received within fifteen days of the date that the RROF is received. 24 C.F.R. § 58.74 (1989). These objections are required to be submitted in writing to HUD, with no apparent opportunity for appearance, hearing, or rebuttal, 24 C.F.R. § 58.76 (1989), and the objection process does not seem likely to create an administrative record that might be useful to a reviewing court. Nor do the regulations establish a comprehensive procedure for all categories of complaints; the class of objections that HUD will consider is circumscribed by § 58.75, which enumerates seven permissible bases for objections to a RROF. Included among these permissible bases are complaints that "the recipient has omitted one or more of the steps set forth at Subparts F and G for the preparation and completion of an EA." 24 C.F.R. § 58.75(c) (1989). We have profound doubts that Cornell's NEPA claim is based completely on alleged violations of subparts F and G, and certainly HUD does not convince us otherwise, failing even to argue this issue. Resort to this objection process would likely not have given Cornell the relief that it is here requesting, and an

exhaustion requirement should not be imposed. *See Pietroniro v. Oceanport,* 764 F.2d 976, 980 (3d Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 554 (1985); *Panola Land Buyers Ass'n v. Shuman,* 762 F.2d 1550, 1557 (11th Cir.1985). And even if these objection procedures comprehended complaints such as Cornell's, the limitations on the format and scope of these objections suggest that this scheme as a general matter is not an adequate administrative remedy.

Prior cases addressing alleged violations of the HCDA's NEPA procedures, moreover, launch immediately into a discussion of the merits with no mention of an exhaustion requirement. *See Dickeyville,* 636 F.Supp. 362; *Colony Federal Savings & Loan Ass'n v. Harris,* 482 F.Supp. 296 (W.D.Pa.1980). And the two cases that cite 24 C.F.R. § 58.73 treat it as part of HUD's procedure for the release of funds rather than as an independent administrative remedy provision. *See Atlantic Terminal Urban Renewal Area Coalition v. New York City Dep't of Environmental Protection,* 697 F.Supp. 666, 669 (S.D.N.Y.1988); *South Portland Avenue Block Ass'n v. Pierce,* 87 C 4210, 1988 WL 101306 (E.D. N.Y. Sept. 28, 1988). Indeed, this regulation is contained in subpart J of the environmental review procedures, which establishes the step-by-step procedure for the release of funds for particular projects; the 15–day objection period appears to be merely one of these steps. *Cf. Davis,* 627 F.2d at 945; *Coalition for Block Grant Compliance v. Dep't of Housing & Urban Dev.,* 450 F.Supp. 43, 49–50 (E.D.Mich. 1978). Cornell's failure to raise its NEPA complaints before HUD during that period, then, does not preclude judicial consideration of Count II.

### 2. Merits of NEPA Claim

█ When a grant recipient files a FONSI, HUD is not obligated to review the

---

HUD fails to cite any other regulations that provide aggrieved parties administrative remedies, and it is not the province of this court to scrutinize the Code of Federal Regulations to supplement HUD's argument, which was improperly presented in a footnote to begin with.

*See United States v. Bentley,* 825 F.2d 1104, 1109 (7th Cir.), *cert. denied,* 484 U.S. 901, 108 S.Ct. 240, 98 L.Ed.2d 198 (1987) (finding an issue raised only in a footnote to be insufficiently presented for decision).

environmental assessment on the merits but rather must accept this finding as long as it is assured that the recipient has complied with NEPA's procedural requirements and HUD's regulations. *See Dickeyville*, 636 F.Supp. at 366; *Colony Federal*, 482 F.Supp. at 303. To the extent that Cornell disagrees only with the substance of the City's environmental assessment findings—including the City's decision not to prepare an EIS—this claim must fail. Cornell raises, however, two procedural challenges to the city's environmental finding of no significant impact, and these claims deserve careful consideration.

### a. *Incomplete Environmental Assessment at time of Application*

■ On July 16, 1986, the City of Chicago filed, with its application for a Housing Development Grant, a certification that the City had completed an environmental assessment and had determined that the Park Tower project would have no significant impact on the environment. Cornell acknowledges this certification but asserts that at the time of this submission, the environmental assessment was far from complete and that the application should therefore not have been processed by HUD. Citing 24 C.F.R. § 58.41, Cornell argues that a finding of no significant impact can only been made upon the completion of an environmental assessment,[12] and 24 C.F.R. § 850.33(m) requires that the applicant's environmental assessment finding pursuant to § 58.41 must be included in a Housing Development Grant application.

While apparently conceding that the environmental assessment in this case had not been completed when the application was filed, HUD maintains that the finding of significant or no significant impact "required to be submitted as part of the application is assumed by HUD to be an interim finding based upon a preliminary evaluation" (Reply Memorandum at 7). In support of this assertion, HUD offers a 1978 Federal Register citation[13] indicating that a related requirement in applications for grants under the Urban Development Action Grant ("UDAG") Program was intended only to ensure that the environmental assessment process had begun. *See* 43 Fed.Reg. 1602, 1603 (1978) (regulation codified at 24 C.F.R. § 570.454(c) (1990)). The regulation discussed in this citation, however, refers to a requirement of an "environmental clearance finding" in the UDAG application. *See* 24 C.F.R. § 570.454(c). Housing Development Grant applications, by contrast, must contain the actual environmental assessment finding of significant or no significant impact. *See* 24 C.F.R. §§ 850.33(m), 58.41. The two application requirements are not sufficiently analogous to permit us to extend the evidence of HUD's intent from the UDAG to the Housing Development Grant context and to assume that § 850.33(m), too, requires only a preliminary environmental finding.

We recognize, however, that some of the City's environmental responsibilities under NEPA are meant to be completed after the application is submitted. In the City's certification of completion of environmental assessment, which appears to be a standard HUD form, the City agrees, "[u]pon selection of this project for Housing Development Grant funding, [to] complete all *remaining* requirements found at 24 C.F.R. Part 58" (emphasis added). Hous-

---

**12.** That regulation provides:
When the EA is completed, the recipient must make either:
(a) A finding of no significant impact (FONSI) in which the recipient determines that the request for release of funds for the project is not an action which may or will significantly affect the quality of human environment; or
(b) A finding of significant impact in which the request for release of funds for the project is deemed to be an action which may significantly affect the quality of the human environment.

The recipient must then proceed with its environmental review under Subparts H or I.
24 C.F.R. § 58.41 (1989).

**13.** HUD additionally cites in its reply memorandum a 1985 HUD policy memorandum that underscores the preliminary nature of the environmental finding required in UDAG applications. Although HUD claims to have attached the relevant passage as exhibit A to its memorandum, no such submission was received by this court or is part of the official court file.

**926**

ing Development Grant regulations, moreover, indicate that a recipient cannot spend funds "until the environmental requirements have been met." 24 C.F.R. § 850.63(e) (1989). *See also* 24 C.F.R. § 58.31 (1989) ("The environmental review process should begin as soon as a recipient determines the projected use of the ... funds"). But HUD has adduced no evidence supporting the proposition that the environmental assessment finding required on the application need not be based on a completed environmental assessment, and we are troubled by the language in § 58.41 suggesting that a finding of no significant impact is to be made upon completion of the environmental assessment. It is not clear, given the current record, what duties must be performed before the application and what duties may be performed later.[14]

Even if acceptance of this application in light of the incomplete environmental assessment was not proper under HUD's regulations and procedures, however, setting aside this action now, after the full environmental assessment was prepared, would serve no purpose. To be sure, the goals fostered by the National Environmental Policy Act are important and the requirements of that Act should not be flouted, but to require HUD and the city to retrace its steps but in a different order seems to be a concession to undue formalism rather than a promotion of this vital national policy, and we decline to do so.

b. *Inadequate Notice*

■ As a second procedural attack on HUD's acceptance of the City's FONSI, Cornell asserts that the City failed to provide them with adequate notice of its envi-

ronmental assessment finding. Cornell points to two alleged omissions on the part of the City: (1) a failure to give Cornell, as an especially interested party, personal notice of its FONSI; and (2) a failure to give notice *before* the threshold finding of no significance was made. In support of the first contention, Cornell refers us to *Colony Federal*, 482 F.Supp. 296, in which the court held that the County's failure to provide specific notice to property owners in an area to be redeveloped under the Housing and Community Development Act may have rendered HUD's acceptance of the environmental assessment finding an abuse of discretion. HUD attempts to distinguish *Colony Federal* on the basis that the regulation calling for heightened notice in that case applies only to those projects for which a finding of significant impact was made.

This argument does not survive a careful reading of *Colony Federal*, however. Although the miscited regulation that is quoted in that case [15] does seem to impose a notice requirement only for the limited situation where an environmental impact statement is to be prepared, a regulation directly following and referring to the requirements of the *Colony Federal* provision establishes unambiguously that the same notice procedure obtains for projects that are found to have no significant impact on the environment. *See* 24 C.F.R. §§ 58.16(b); 58.17(b) (1979); *Brandon v. Pierce*, 725 F.2d 555, 561 (10th Cir.1984).[16] Sections 58.16(b) and 58.17(b) no longer contain the notice specifications for the environmental review process, but the substituting regulations, 24 C.F.R. §§ 58.43 and 58.55 (1989),

14. That HUD's environmental review regulations refer uniformly to the "grant recipient" or "recipient" does not mean that all environmental duties are performed by those who already have won preliminary approval for grant requests; 24 C.F.R. § 58.2(a)(2)(iii) (1989) includes grant applicants in its definition of recipients.

15. The *Colony Federal* court omits a period, referring to 24 C.F.R. § 5817(b) rather than § 58.17(b).

16. This broader applicability might have been somewhat difficult to glean in light of the citat-

ing error of the *Colony Federal* court but should nevertheless have been evident to HUD given the posture of the case: the plaintiffs there, like Cornell, were complaining of the County's failure to notify them of its finding of no significant impact. And although the regulations referred to in *Colony Federal* have been superseded by subsequent regulations, a quick perusal of HUD's notice provisions in the most recent Code of Federal Regulations would have confirmed that the specific notice requirement continues to apply even in the absence of an environmental impact statement. *See* 24 C.F.R. § 58.43 (1989).

include notice specifications that closely resemble those that they replace. Section 58.43, which establishes the publication and dissemination requirements for findings of no significant impact, provides *inter alia:*

> As a minimum the recipient must send the FONSI to the local new media, to *individuals and groups known to be interested* in its activities; to appropriate local, State, and Federal agencies; to the Headquarters and appropriate Regional Office of the Environmental Protection Agency, and to the HUD Area Office (or the State, where applicable).

24 C.F.R. § 58.43 (1989) (emphasis added). To the extent that Cornell is an interested party and that HUD knew or should have known of this status, failure to provide it with specific notice constitutes procedural error.

Cornell maintains that it qualifies as an interested party meriting specific notice because of the proximity of the Cornell Village Tower Condominium to the Park Tower site and the injuries that it will allegedly suffer. These circumstances, Cornell argues, render it at least as interested as the property owners in *Colony Federal.* Although we disagree with the latter assertion, for the *Colony Federal* plaintiffs owned property that was to be condemned to make way for the project at issue and thus their interest was more manifest, HUD does not object to Cornell's self-characterization as an interested party. HUD does contend, arguing in the alternative, that it cannot be held responsible for this procedural omission because it was not aware of Cornell's special interest in the Park Tower project before approving the City's request for release of funds. This representation appears only in HUD's reply memorandum, however; the record contains no corroborating evidence. Standing alone, this unsupported assertion is not sufficient to establish HUD's lack of knowledge of Cornell's interest as uncontested and cannot sustain HUD's motion for summary judgment on this issue. We therefore find a material fact to remain regarding the very narrow issue of whether HUD knew or should have know of Cornell's special interest (and therefore whether the failure to give personal notice constituted the sort of procedural error that should have triggered a refusal to release funds).

■ By contrast, Cornell's second notice argument does not survive the summary judgment motion. Cornell concedes that notice of the City's finding of no significant impact was published in a Chicago newspaper but argues that because the publication occurred after the City had made its environmental assessment finding, the public was deprived of an opportunity to contribute meaningful input. In fashioning this argument, Cornell relies on *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir.1972) ("*Hanly II*"), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), a case involving the General Services Administration's NEPA responsibilities associated with a plan to build a prison facility in Manhattan. The Second Circuit in *Hanly II,* discussing the procedures necessary to ensure public input before a finding of significance is made under NEPA, held that

> before a preliminary or threshold finding of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision.

471 F.2d at 836. The court declined to establish specific procedural guidelines, however, leaving that task to "the agency, which should be in a better position than the court to determine" the most effective method of collecting public opinion. *Id.*

The Seventh Circuit has not squarely confronted the issue of enhanced notice requirements and therefore has not explicitly adopted the *Hanly II* holding. *See West Chicago, Illinois v. U.S. Nuclear Regulatory Comm'n,* 701 F.2d 632, 648 n. 15 (7th Cir.1983). Even if *Hanly II* notice were required in this Circuit, however, the procedures set forth in HUD's environmental review regulations appear to comply with the prescripts of *Hanly II.* At least fifteen days before a request for release of funds and certification is submitted to

HUD, a finding of no significant impact must be published and disseminated to the public. 24 C.F.R. §§ 58.43, 58.45 (1989). The environmental assessment finding is not final until this fifteen-day period, during which public comments are to be entertained, has expired. *See* 24 C.F.R. § 58.44 (1989) ("The recipient must take into account the comments received in response to [published] notices before proceeding with a RROF and certification."). While not attacking these procedures, Cornell argues that the published notice in this case gave the public only an opportunity to file a dissenting opinion after the finding of no significant impact was final. The City's publication, however, which invites "all interested agencies, groups, and persons disagreeing with" the significance finding "to submit written comments for consideration by the City of Chicago," conforms to HUD's established procedures and belies Cornell's representation. We therefore hold that the City afforded the public a sufficient opportunity to be heard before its certification to HUD that the project would not significantly affect the environment.[17]

### CONCLUSION

For the foregoing reasons, HUD's motion to dismiss is denied, and its motion for summary judgment is denied in part and granted in part. Count I is, accordingly, stricken from the complaint. Cornell's claim of a violation of HUD's NEPA responsibilities in light of the City's failure to provide Cornell with specific notice of the finding of no significant impact remains in the suit.

---

17. The *Hanly* decision also indicates that in certain circumstances a pre-finding formal hearing should be provided to solicit public opinion. Such a hearing is not always required, however, *see Continental Illinois National Bank & Trust*

*Co. of Chicago v. Kleindienst,* 382 F.Supp. 107, 113 (N.D.Ill.1973), and Cornell does not argue that a failure to provide a hearing in this case constitutes procedural error.