**David CASTENSON, Kristi Castenson, Barbara Cummins, and Velma Castenson, Plaintiffs,**

v.

**CITY OF HARCOURT, and Roy Tallman, Individually and in his Official Capacity as Mayor of the City of Harcourt, Defendants.**

**No. C 99–3031–MWB.**

United States District Court, N.D. Iowa, Central Division.

March 8, 2000.

Blake Parker, Blake Parker Law Office, Fort Dodge, Iowa, for plaintiffs.

Robert Goodwin, Goodwin Law Office, P.C., Ames, Iowa, for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION .............. 869
   A. Procedural Background ..... 869
   B. Factual Background ....... 870
II. LEGAL ANALYSIS ............ 874
   A. Standards For Summary Judgment ................ 874
   B. The Parties' Contentions ... 875
   C. The False Certification Claim ................... 875
     1. Nature of the claim ..... 875
     2. Authority for the claim ................ 876
     3. Is the claim amenable to summary judgment? ................ 878
   D. The FONSI Notice Claim... 881
     1. The notice requirement ................. 882
     2. Were the Castensons entitled to personal notice of the FONSI? ................. 884
III. CONCLUSION ................ 886

One question that seems to arise with increasing frequency in modern times is, where shall we put facilities everybody needs, but nobody wants on their doorstep? In this case, that vexatious question is raised by the defendant city's attempts to locate a sewage lagoon on the plaintiffs' farm. However, whether or not their farm is the right place for the sewage lagoon— and the plaintiffs vehemently assert that it is not—is not an issue before the court. Rather, the issues before the court, as is so often the case, are primarily procedural rather than substantive: The plaintiffs claim that the city improperly obtained

funds to pursue the sewer project that includes the sewage lagoon and violated the plaintiffs' civil rights by failing to give them proper notice of a finding of no significant environmental impact from the sewage lagoon. Cross-motions for summary judgment on these claims are now before the court.

## I. INTRODUCTION

### A. Procedural Background

Plaintiffs David and Kristi Castenson, Barbara Cummins, and Velma Castenson (collectively the Castensons) brought this action on April 29, 1999, against defendants City of Harcourt, Iowa, and Roy Tallman, the Mayor of the City. Count I of the Castensons' complaint alleges that the City obtained federal Community Development Block Grant (CDBG) funds from the state administering agency, the Iowa Department of Economic Development (IDED), to pursue a sewer project upon Mayor Tallman's false certification that the City had complied with all applicable requirements of state and federal law. The Castensons allege that, contrary to Mayor Tallman's certification, the City had not complied with the requirements of the National Environmental Policy Act (NEPA) of 1969, because the City had not performed either an archaeological survey or a wetlands survey as part of an environmental assessment (EA). Thus, the Castensons contend that the City obtained the CDBG funds on the basis of a false certification of compliance with federal law. As relief on this claim, the Castensons seek declaratory judgment and injunctive relief requiring return of the improperly obtained CDBG funds and barring receipt of further funds for the sewer project until the project is in compliance with the law. Count II of the Castensons' complaint is an action pursuant to 42 U.S.C. § 1983 in which the Castensons allege that the City violated their civil rights by failing to provide them with notice of the City's finding of no significant impact (FONSI) for the sewage lagoon, as required by NEPA and regulations of the United States Department of Housing and Urban Development (HUD), prior to seeking release of the CDBG funds for the sewer project. The Castensons seek declaratory judgment of a violation of NEPA's notice requirements, compensatory and punitive damages, and reasonable attorneys fees as relief on this claim.

On June 21, 1999, in lieu of answering the complaint, the City and the Mayor filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, in which the defendants assert that the Castensons' complaint fails to state claims upon which relief can be granted. The City and the Mayor filed an amended motion to dismiss and amended and substituted brief in support of that motion on July 12, 1999. In their amended and substituted motion, the City and the Mayor advance several grounds for dismissal. First, they contend that the Castensons' complaint is premature, because, at least at the time the Castensons filed their lawsuit, the City was not required to send a FONSI notice to the Castensons, as they were not then known to be persons with a potential interest in the location of the sewage lagoon. Second, the City and the Mayor contend that there is no private right of action under NEPA and that the Castensons cannot properly pursue their claims through the Administrative Procedure Act (APA), 5 U.S.C. § 702, because they have not established that they are aggrieved within the "zone of interest" sought to be protected by NEPA. Third, the defendants assert that the Castensons have not complied with various regulations, including failure to make a timely challenge to the sewer project, as required under 24 C.F.R. §§ 58.45 and 58.74; failing to exhaust administrative remedies, as required by 24 C.F.R. § 58.76, by first directing their objections to the release of funds to HUD or the IDED; and seeking a remedy—return of the CDBG funds— that is not permitted under 24 C.F.R. § 58.75. Next, the defendants contend that the Castensons have not alleged any action "under color of state law," as required for a § 1983 action, because they have alleged

only violations of federal law, not state law. Finally, the City and the Mayor contend that the statute of limitations expired on any claim of failure to provide individual notice of the City's FONSI that was published on June 12, 1996, before the Castensons filed their lawsuit. The defendants appended various affidavits and documents to their motion to dismiss.

On July 20, 1999, the Castensons resisted the motion to dismiss, countering each of the defendants' grounds for dismissal, and likewise appending a large volume of documents in support of their resistance. After an extension of time to do so, the defendants filed a reply brief on September 9, 1999, adding yet more documents to the record. On October 23, 1999, this court notified the parties that, in light of the voluminous documents offered in support of and resistance to the motion to dismiss, some of which appeared to be part of the public record, and others of which were not, the motion to dismiss pursuant to Rule 12(b)(6) would be converted into and considered as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties were given to and including November 8, 1999, within which to supplement the motion and resistance thereto, if appropriate, in light of this conversion.

On November 8, 1999, the City and the Mayor filed a supplement to their converted motion for summary judgment. On November 12, 1999, the Castensons filed their own cross-motion for summary judgment, incorporating therein a resistance to the defendants' converted motion. The City and the Mayor moved to strike the Castensons' motion for summary judgment on November 17, 1999, asserting that their own motion was the only one properly before the court. On January 11, 2000, the court denied the defendants' motion to strike, concluding that, regardless of whether the defendants' motion to dismiss was converted to a motion for summary judgment, the plaintiffs' motion for summary judgment was timely and appropriate under Rule 56(a), because the plaintiffs' motion was filed more than twenty days after the commencement of this action. The court therefore set deadlines for further briefing on the Castensons' motion for summary judgment and set oral arguments on the pending dispositive motions for March 1, 2000. The oral arguments were later moved to February 29, 2000.

Returning to the Castensons' November 12, 1999, motion for summary judgment, the Castensons assert that they, not the defendants, are entitled to summary judgment on both of their claims. As to Count I, the Castensons contend that the undisputed record establishes that no archaeological assessment, as required by NEPA, was done or timely done prior to obtaining CDBG funding. As to Count II, the Castensons contend that it is undisputed that they were entitled to notice of the June 12, 1996, FONSI and that they did not receive such notice. Thus, they contend that their due process rights have been violated as a matter of law. The defendants resisted the Castensons' motion for summary judgment on January 24, 2000, and the Castensons filed a reply on February 7, 2000.

The court heard oral arguments on the parties' dispositive motions on February 29, 2000. The Castensons were represented at the oral arguments by Blake Parker of the Blake Parker Law Office in Fort Dodge, Iowa. The City and Mayor Tallman were represented by Robert Goodwin of the Goodwin Law Office, P.C., in Ames, Iowa.

Following oral arguments, on March 1, 2000, the City and the Mayor proffered one further supplement to their resistance to the Castensons' motion for summary judgment. The Castensons notified the court by letter dated March 3, 2000, that they had no objections or response to this final supplementation of the record.

### B. Factual Background

The court will discuss here only the nucleus of undisputed facts pertinent to the present cross-motions for summary judgment. In its legal analysis, the court will address, where necessary, the parties'

assertions of genuine issues of material fact that may preclude summary judgment on the Castensons' claims. Just as importantly, this statement of the factual background does not attempt to state all of the steps in the circuitous procedure that led to the City's current attempts to construct the sewage lagoon on the Castensons' property. Rather, noting the focus of the Castensons' claims upon the truthfulness of certifications of compliance with NEPA in the City's attempts to secure CDBG funding and the lack of proper notice to the Castensons of the June 12, 1996, FONSI, this statement of factual background will focus on the City's environmental assessments (EAs), FONSIs, lagoon site determinations, and CDBG application process.

David and Kristi Castenson reside on a farm located outside of the City's western limits. Their farm is now the projected site for sewage lagoon for the City's new sewer system. The farm is owned by David Castenson and his sister, plaintiff Barbara Cummins, doing business as B & D Farms. Plaintiff Velma Castenson is the mother of David and Barbara and a resident of the City.

The City of Harcourt is a municipality of about 300 residents in Webster County, Iowa.[1] In 1972, the City first began looking at a city-wide sewer system to replace the existing system of private septic tanks. However, such a project, which had apparently contemplated a sewage lagoon north of the City limits, did not come to fruition at that time.

Interest in a sewer project for the City was renewed in the 1990s. In 1994, the City authorized Fox Engineering to prepare a preliminary engineering report for the project. That report, completed by project engineer James A. Merideth on November 11, 1994, recommended a sewage lagoon to the north of the City, with a sewage lift station. *See* Plaintiffs' Exhibit 1; Plaintiffs' Exhibit 3, Appendix J.[2] This location for the sewage lagoon will be referred to herein as the "North Site." However, in a letter dated December 27, 1994, to Richard Sandal of the Iowa Department of Natural Resources (IDNR), which was copied to the City, concerning the status of the funding application for the project, Mr. Merideth mentioned discussions with the City about consideration of "a different lagoon site prior to actual design of a project." Plaintiffs' Exhibit 13. Mr. Merideth's letter continued, "The alternate site would be west of the City in an area that may allow better use of gravity flow to serve areas on the west side of the community and possibly, several commercial properties along the state highway at the northwest corner of the community." *Id.* This is the earliest indication in the record of the City's consideration of a "West Site" for the sewage lagoon.

On November 20, 1995, the City Council approved submission of applications to the IDED for "CDBG assistance" for the sewer project. Plaintiffs' Exhibit 2. Therefore, on November 20, 1995, Mayor Tallman signed a "CDBG APPLICATION FORM—GENERAL COMPETITION" (the CDBG Application), in which the Mayor, in pertinent part, made the following certification:

> I also certify that to the best of my knowledge and belief, data in the application is true and correct, including any commitment of local resources, the document has been duly authorized by the governing body of the applicant, and the applicant will comply with all applicable federal and state requirements, including the following, if assistance is approved:
>
> ***

1. The City estimates that there will be about 135 sewer connections to serve the residents, when the sewer project is completed.

2. The report in Plaintiffs' Exhibit 1 is incomplete, because it ends in mid-sentence on page 30. *See* Plaintiffs' Exhibit 1. However, a complete copy of the report appears in Appendix J to Plaintiffs' Exhibit 3.

G. National Environmental Policy Act of 1969.

Plaintiffs' Exhibit 3 at 23. The CDBG Application also states that "[s]everal activities have been accomplished to speed the project toward completion upon notice of award." *Id.* at 17. In the list of such activities, the CDBG Application states that "[a]n environmental assessment has been prepared," and "[a] site for the lagoon has been selected, but is subject to change with final design work." *Id.*

As to the "environmental assessment," the CDBG Application notes the following:

The State Historical Society of Iowa (SHPO) has provided the standard opinion that a survey will be required prior to construction of the treatment lagoon. That step is being postponed pending action by funding agencies.

*Id.* As to the site of the sewage lagoon, the CDBG Application refers to a "location map" in Appendix A. *Id.* This "location map" shows only a sewage lagoon to the north of the City, north of U.S. Highway 175, *i.e.*, the "North Site." Also, although the CDBG Application states that an "environmental assessment" had been "prepared" prior to filing of the Application on November 20, 1995, there is no record of a completed EA prior to that date. There is, instead, evidence of correspondence prior to that date concerning the necessity of an archaeological survey—one of the grounds on which the Castensons challenge the adequacy of the EAs in this case—indicating that preparation of an EA had commenced. That correspondence is reviewed below.

On April 12, 1996, the Rural Economic and Community Development Office of the United States Department of Agriculture (USDA–RD) completed the first EA for the City's sewer project. Plaintiffs' Exhibit 15. The USDA–RD EA contemplated only a "North Site" for the sewage lagoon. *See id.* (location map showing a proposed sewage lagoon only on the "North Site"). That EA indicates that no wetlands, historical, or archaeological sites will be affected by the proposal or are located within the project site. *Id.* at ¶ 2 a. & e. The attachment to the EA explains, in Part 2, that the State Historical Society, acting as the State Historical Preservation Officer (SHPO), had nevertheless recommended an archaeological survey at the location of the proposed lagoon—*i.e.*, at the "North Site," and connection trench—owing to previously recorded archaeological sites in the area. *Id.* at Attachment, Part 2. The EA indicates that the parties were "in the process of obtaining additional information," and that, if an archaeological survey was required upon further review, it would be completed to avoid any adverse impact on historical or archaeological sites. *Id.* The appropriate official for the USDA–RD approved this EA on December 9, 1996, and a FONSI was issued that day. *See* Plaintiffs' Exhibit 32. The Castensons did not receive any individual notice of this FONSI, nor was it published, because USDA–RD regulations in force at the time did not require such publication.

On June 4, 1996, Steve Hoesel, the Environmental Review Officer for the Mid–Iowa Development Assistance Service (MIDAS), acting on behalf of the City, prepared another EA, entitled "ENVIRONMENTAL CLEARANCE WORKSHEET IOWA COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM" (the MIDAS EA). *See* Plaintiffs' Exhibit 37. Mr. Hoesel testified in deposition that the MIDAS EA was prepared, in part, with access to and reliance on the USDA–RD EA, and the Castensons have not disputed this fact. The MIDAS EA includes a map showing the location of the City and the general location of two proposed lagoon sites, using large triangles, one to the north of the City and one to the west. *See id.* (Map). The triangles indicating the lagoon sites do not appear to be to scale and the map does not show any property lines or topographic features, apart from county roads and federal highways, an unidentified creek, presumably East Buttrick Creek, and an abandoned Northwestern Railroad line. *Id.* The MIDAS EA again records the SHPO's recommendation that

an archaeological survey be completed for the "North Site." (*Id.* at E. 4). However, the MIDAS EA states that MIDAS had determined that no archaeological survey was required at that time, in light of information MIDAS had obtained from the USDA Farm Home Administration and that federal agency's recommendation that no such survey was needed. *Id.* The EA also states undertakings that, if any artifacts are discovered during construction, construction will cease until archaeologists can review the findings. *Id.* The MIDAS EA concluded that there were no permanent or semi-permanent impacts upon the environment from the project. *Id.* at O. A FONSI and concurrent public notice of a request for release of funds were published on June 12, 1996, in an area newspaper, *The Dayton Review.* Plaintiffs' Exhibit 33. The Castensons did not receive individual notice of this FONSI either.

On June 29, 1996, Mayor Tallman signed a "REQUEST FOR RELEASE OF FUNDS AND CERTIFICATION—IOWA COMMUNITY DEVELOPMENT BLOCK GRANT." *See* Plaintiffs' Exhibit 22. This Request for Release of Funds, or RROF, includes a certification that "[t]he recipient has complied with the National Environmental Policy Act of 1969, as amended, and with the environmental procedures, permit requirements and statutory obligations of the laws cited in 24 C.F.R. § 58.5." *Id.* at Part 2, ¶ 2. The RROF also certifies that the City has complied with other HUD regulations pertinent to NEPA. *See id.* at ¶¶ 3–6. The CDBG contract was awarded on March 15, 1996. Plaintiffs' Exhibit 4.

On March 3, 1997, the minutes of a City Council meeting, which show Mr. Castenson was in attendance, also record that Mr. Meredith recommended that the City approve location of the sewage lagoon "going west of Harcourt onto the property of David Castenson," to save the $50,000 cost of a lift station and the regular repairs to that lift station. *See* Plaintiffs' Exhibit 39. The minutes indicate that Mr. Castenson requested that the lagoon be moved from the location shown on Mr. Meredith's map

to the north side of a drainage ditch in that location, because, according to the minutes, "the soil on the north side is not good for farming." *Id.* The minutes do not clearly indicate whether or not the north side of the drainage ditch was also on Mr. Castenson's property. The City Council approved a motion "to use west location on north side of the ditch as first choise [sic] of site selection," and a subsequent motion "to make west location south of the ditch as the second choice site selection." *Id.* Mr. Meredith's undisputed deposition testimony is that he concluded that a site for the sewage lagoon to the west of the City was preferable to the "North Site" based on aerial mapping, which involved the taking of aerial photographs of the area on May 30, 1996, the return of aerial maps in late July, and Mr. Meredith's own analysis of those maps over approximately the next four months. Meredith Deposition (attached to Defendants' Amended and Substituted Brief in Support of Motion To Dismiss), pp. 18–20.

Although Mr. Castenson was present at the City Council meeting on March 3, 1997, the Castensons contend that the first they learned that their farm was being considered as a site for the City's sewage lagoon was sometime after April 23, 1997, when the City filed a construction permit application, Plaintiffs' Exhibit 5, and request for a variance from the IDNR. Plaintiffs' Exhibit 6. The Castensons contend that they did not receive notice of the construction permit until well into May of 1997.

The most recent additions to the record indicate that the City completed an EA of the lagoon site on the Castensons' property, including wetlands and archaeological surveys, on November 8, 1999. This EA was approved by James A. Carroll, the State Environmental Coordinator for the USDA, on November 26, 1999, and the Castensons received personal notice of the draft EA by letter dated December 2, 1999. The draft EA was also published in the Gowrie and Dayton newspapers on

December 8, 1999, with notice of a thirty-day comment period. The USDA received no comments within the thirty-day period. Therefore, on January 11, 2000, the USDA–RD finalized the EA and signed a FONSI for the current location of the sewage lagoon. The USDA–RD then notified the Castensons of the FONSI on January 13, 2000, and published notice of the FONSI in the Dayton and Gowrie newspapers the week of January 16, 2000. *See* Attachments to Defendants' Resistance to Plaintiffs' Motion For Summary Judgment.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R.CIV.P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd*, 202 F.3d 1035 (8th Cir.2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 2000 WL 84400 (8th Cir. Jan. 21, 2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(a)–(c) (emphasis added). Thus, the moving party bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). The resisting party is then required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick*

*v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394. If, on summary judgment, a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). With these standards in mind, the court turns to consideration of the parties' cross-motions for summary judgment on the Castensons' claims.

### B. The Parties' Contentions

Although they do not always make clear which contentions go to which claims, the City and the Mayor contend that they are entitled to summary judgment on the Castensons' claims on several grounds: the Castensons were not entitled to a FONSI notice in June of 1996; there is no private right of action under NEPA and the Castensons fail the "zone of interest" test for standing to assert their claims of NEPA violations through the APA, 5 U.S.C. § 702; the Castensons have not complied with various HUD regulations to challenge the sewer project; the Castensons failed to exhaust administrative remedies; the Castensons seek a remedy—return of the CDBG funds—that is not permitted under 24 C.F.R. § 58.75; the Castensons have not alleged any action "under color of state law," as required for a § 1983 action, be-

cause they have alleged only violations of federal law; and the statute of limitations has expired on any claim of failure to provide individual notice of the FONSI that was published on June 12, 1996.

For their part, the Castensons contend that they are entitled to summary judgment in their favor on Count I of their complaint, because they contend that it is undisputed that the Mayor's certifications of compliance with NEPA, upon which release of CDGB funds was in part premised, were false. As to Count II, the Castensons contend that it is undisputed that they were entitled to notice of the June 12, 1996, FONSI and that they did not receive such notice, thus establishing a violation of their due process rights.

The court does not find that it is necessary to reach each and every ground raised by the parties; instead, the court finds that the cross-motions for summary judgment can be resolved on quite narrow, albeit essential, grounds. The court will address the propriety of summary judgment on each count in turn.

### C. The False Certification Claim
#### 1. Nature of the claim

■ The parties dispute the very nature of the Castensons' first claim. The City and the Mayor refer to it as a claim asserting a "violation of NEPA." Therefore, they challenge the claim on the grounds that (1) there is no private right of action under NEPA, and (2) the Castensons cannot establish that they are within the "zone of interest" of NEPA, so that they lack standing to assert a "NEPA violation" claim under the APA. Although the Castensons have themselves from time to time described this claim as alleging a "violation of the National Environmental Policy Act of 1969," *see, e.g.*, Plaintiffs' Brief In Support Of Motion For Summary Judgment at 3, they counter the defendants' "no private right of action" and "standing" challenges to this claim on the ground that this claim is not an action for "violation of NEPA." According to the Castensons, it is instead a

"*qui tam* action,"[3] or in the nature of a *qui tam* action, with the following objectives: to enforce the rules and regulations of the CDBG program; to force the City to return CDBG funds obtained on the basis of false certifications of compliance with NEPA requirements; and to compel the City to start over in the CDBG application process. The Castensons assert that, although this Count is not a claim under the False Claims Act (FCA), 31 U.S.C. §§ 3729–33, it is similar to a *qui tam* claim under the FCA, in that it alleges that the CDBG program has been defrauded by the City's and the Mayor's misrepresentations about compliance with NEPA.

To determine the true nature of the claim, the court has looked to the parts of the Castensons' Complaint that state the wrongdoing on which this Count is based. The pertinent parts of the Complaint are the following:

24. The Request for Release of Funds and Certification signed by Mayor Roy Tallman, individually and in his official capacity as the Mayor of the City of Harcourt is false and in violation of the National Environmental Policy Act of 1969, as amended.

25. The receipt of CDBG funds from the Iowa Department of Economic Development was solely based on the certification of Mayor Roy Tallman for and on behalf of the City of Harcourt.

*See* Complaint, Count I, ¶¶ 24–25. It is clear from these portions of the complaint that the gravamen of the claim in Count I is not a "violation of NEPA," but a misrepresentation of compliance with NEPA in order to obtain CDBG funds—in other words, this claim is some kind of "*qui tam* action" by private citizens alleging a fraud upon a government funding program.

### 2. *Authority for the claim*

■ Although the Castensons assert that this Count is *not* a claim under the False Claims Act (FCA), 31 U.S.C. §§ 3729–33, but is only *similar to* a *qui tam* claim under the FCA, the Castensons have cited no other authority for such a claim, and the court can find no authority other than the FCA for their "*qui tam* action." *See, e.g., United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734 (3d Cir.1997) (*qui tam* action under the FCA by relator against county alleging that county misused HUD funds). The FCA provides, in pertinent part, that "[a]ny person who ... knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government ... is liable to the United States Government for a civil penalty ... plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3129(a)(2). Although "government" as used in the FCA means the federal government, *see, e.g., United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 334 (6th Cir.1998), and the CDBG funds at issue here were administered by a state agency, the IDED, the CDBG funds are federal funds from the HUD, so that the wrongdoing of the City and the Mayor that the Castensons allege appears to fall within the scope of the prohibition of the FCA. Although "only those actions by the claimant [for funds] which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered 'claims' within the meaning of the FCA," *United States ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir.1998), the con-

---

**3.** According to BLACK'S LAW DICTIONARY, a "*qui tam* action" "is an action brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the state or some other institution. It is called a '*qui tam* action' because the plaintiff states that he sues *as well* for the state as for himself." BLACK'S LAW DICTIONARY (6th ed.1991).

duct of the City and the Mayor, as alleged here, fits within the scope of the FCA thus defined.

The FCA authorizes a *qui tam* action by providing that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3130. "The focus of the Act is on exposing fraud on the government and recovering resulting government losses." *United States ex rel. Rodgers v. State of Ark.*, 154 F.3d 865, 868 (8th Cir.1998), *cert. dismissed,* —— U.S. ——, 119 S.Ct. 2387, 144 L.Ed.2d 768 (1999); *accord United States ex rel. Zissler v. Regents of Univ. of Minn.*, 154 F.3d 870, 874 (8th Cir.1998) (discussing the purpose and history of the FCA). However, "[t]he action [under the FCA] shall be brought in the name of the Government," 31 U.S.C. § 3130, and "[a] great deal of Section 3730 establishes as superior the role of the government in the prosecution of *qui tam* suits." *United States ex rel. Rodgers*, 154 F.3d at 868. Thus, " '[q]ui tam* relators cannot and do not sue for FCA violations on their own behalf. Rather, they sue on behalf of the government as agents of the government, which is always the real party in interest.' " *Id.* (quoting *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1217 n. 8 (9th Cir.1996)). The Castensons have not explained in any persuasive way how their "*qui tam* action" falls outside the scope of the FCA, nor have they identified any other sufficient authority for such an action. The court also finds that the Castensons have not brought their "*qui tam* action" in the name of the government, as required by 31 U.S.C. § 3130.

■ Not only does the government retain a "superior role" in any *qui tam* action under the FCA, *United States ex rel. Rodgers*, 154 F.3d at 868, the FCA establishes several procedural requirements before the *qui tam* relator, rather than the government, may pursue the suit. As the Fifth Circuit Court of Appeals recently explained,

To initiate a *qui tam* action, a relator must serve on the government the complaint and a written disclosure of the information he possess. *See* [31 U.S.C.] § 3730(b)(2). The Attorney General then must decide, within sixty days, whether to "intervene and proceed with the action." *See id.* By the expiration of the sixty days, the Attorney General must inform the court whether the government shall proceed with the action; if not, "the person bringing the action shall have the right to conduct the action." *See id.* § 3730(b)(4)(B).

*Riley v. St. Luke's Episcopal Hosp.*, 196 F.3d 514, 517 (5th Cir.1999), *reh'g en banc granted,* 196 F.3d 561 (5th Cir.1999). Furthermore, during the period for government review, "[t]he complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b)(2). These provisions for review by the government are in part to prevent "groundless suits." *See United States ex rel. Cantekin v. University of Pittsburgh*, 192 F.3d 402, 409 (3d Cir. 1999).

Nothing in the record indicates that the Castensons fulfilled the requirements of 31 U.S.C. § 3730(b)(2) by filing the complaint under seal before serving the defendant, then serving the government a copy of the complaint and a written disclosure of the information they possessed. Nor does the record show that the Castensons obtained an order of the court before unsealing the complaint and serving it on the defendants. *Id.* Finally, there is no indication that the Attorney General was given the opportunity to intervene in this action. *Id.* Thus, the Castensons have not complied with the procedural requirements stated in § 3730(b)(2) to pursue a *qui tam* action under the FCA.

The Ninth Circuit Court of Appeals has held that the requirements of § 3730(b)(2) are not jurisdictional, *see United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 245 (9th Cir.1995), and this court agrees that these requirements are more

in the nature of non-jurisdictional procedural preconditions. *See United States ex rel. Mikes v. Straus*, 931 F.Supp. 248, (S.D.N.Y.1996) (requirements of § 3730(b)(2) are mere procedural requirements, not jurisdictional prerequisites). As such, deficiencies in these procedural preconditions are presumably curable. *Cf. Whitmore v. O'Connor Mgmt., Inc.*, 156 F.3d 796, 800 (8th Cir.1998) (holding, by analogy to Title VII cases, that the Missouri courts would consider a right-to-sue letter as a condition precedent, not a jurisdictional prerequisite, to suit under the Missouri Human Rights Act (MHRA), and the absence of such a letter, as in Title VII cases, was a defect curable after suit was filed); *Jones v. American State Bank*, 857 F.2d 494, 499–500 (8th Cir.1988) (the receipt of a right-to-sue notice is not a jurisdictional prerequisite, but rather is a condition precedent to filing a Title VII claim, curable after the action has commenced). Thus, the court's subject matter jurisdiction is not implicated by the Castensons' failure to comply with the procedural requirements of § 3730(b)(2). The court also recognizes the possibility, albeit remote, that the Castensons could demonstrate some authority other than the FCA for their claim in Count I. In these circumstances, the court concludes that it can properly proceed to the question of whether either the plaintiffs or the defendants are entitled to summary judgment on the Castensons' "*qui tam* claim" despite the Castensons' failure to comply with the procedural prerequisites to a *qui tam* action under the FCA.

### 3. Is the claim amenable to summary judgment?

To prevail on their "*qui tam* claim," construed as a claim that the defendants made false statements about NEPA compliance to obtain CDBG funds from the government, whether the claim is brought under the FCA or some other authority, the Castensons must demonstrate that a claim for payment from the government was made and that the claim was "false or fraudulent," that is, based upon a false statement. *Cf. Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 563 (8th Cir.1997) (stating the elements of a claim under the FCA), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998). In an FCA action—and this court finds, in any similar "*qui tam* action" based on the allegations presently before the court—summary judgment is appropriate if the plaintiff lacks sufficient evidence to show that any false or fraudulent claims have been made. *Cf. id.; see also Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492 (same). As explained below, the Castensons cannot meet their "initial responsibility" of identifying portions of the record that show beyond dispute that the City or the Mayor made false statements or certifications of compliance with NEPA in order to obtain CDBG funds, in support of their own motion for summary judgment on this claim, *see Hartnagel*, 953 F.2d at 395, nor can they generate a genuine issue of material fact on this issue, in resistance to the defendants' motion for summary judgment. *See* FED.R.CIV.P. 56(e) (the resisting party is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325. Therefore, the City and the Mayor, not the Castensons, are entitled to summary judgment on this claim.

■ The Castensons point to three purportedly false certifications in the CDBG application process.[4] The first "false" cer-

---

4. As the court reads the Complaint, the only false statement alleged therein appears to be a

tification they identify in their briefs is what they assert was the Mayor's certification that the City "is in compliance with NEPA" in the City's application for CDBG funds, Plaintiffs' Exhibit 3 at p. 23. *See* Plaintiffs' Brief In Support Of Motion For Summary Judgment at 4. The Castensons, however, mischaracterize what it is the Mayor certified in the CDBG Application. As quoted above, in the court's statement of the factual background, what the Mayor actually certified in the CDBG Application, on November 20, 1995, was the following: "the applicant *will comply* with all applicable federal and state requirements, including [NEPA]." Plaintiffs' Exhibit 3 at 23 (emphasis added). Therefore, the Castensons have failed to identify here a portion of the record showing beyond dispute that the Mayor falsely certified that the City "is in compliance with NEPA" in the CDBG Application, *see Hartnagel*, 953 F.2d at 395 (requiring the movant to identify portions of the record showing that there is no genuine issue that the movant is entitled to judgment as a matter of law), because the CDBG Application contains no such certification. Nor have they shown beyond dispute, or even generated a genuine issue of material fact, that the Mayor's certification that the City *would comply* with NEPA was false when that certification was made in the CDGB Application, because there is no real basis in the record for that contention, either. *See Hartnagel*, 953 F.2d at 394 (an issue of material fact is genuine if it has a real basis in the record). Thus, the Castensons can neither support their own motion for summary judgment, nor defeat the defendants' motion, on this claim on the basis of this first purportedly false certification.

■ Almost in passing, the Castensons appear to assert that the Mayor also falsely certified in the CDBG Application that

an EA had been "completed," when no EA was completed by any agency until almost six months later, on April 2, 1996. *See* Plaintiff's [sic] Reply Brief In Support Of Plaintiff's [sic] Motion For Summary Judgment at 3. Again, as the court noted in its statement of the factual background, the CDBG Application states that "[a]n environmental assessment has been *prepared*," *see* Plaintiffs' Exhibit 3 at 17 (emphasis added), not that one had been "completed." A statement that the assessment had been "prepared" will not bear the inference that the City falsely asserted that an EA had been "completed." Rather, the CDBG Application itself explains the status of the EA, the City's recognition of the concerns of the SHPO about the desirability of an archaeological survey *prior to construction of the treatment lagoon*, and the City's decision to postpone such a survey pending action by funding agencies. *Id.* Thus, by pointing to this portion of the CDBG Application, the Castensons have not identified a portion of the record that shows beyond dispute that there was a "false" certification by the City, and thus entitling them to summary judgment on Count I, *see Hartnagel*, 953 F.2d at 395 (requiring the movant to identify portions of the record showing that there is no genuine issue that the movant is entitled to judgment as a matter of law), nor have they generated a genuine issue of material fact on this purportedly false certification, in an effort to defeat the defendants' motion for summary judgment, because there is no basis in the record for such a contention. *See id.* at 394 (an issue of material fact is genuine if it has a real basis in the record).

■ The last portion of the record the Castensons identify as establishing beyond dispute that the City made false certifications of compliance with NEPA is the

false statement and certification in the request for release of funds (RROF). *See* Complaint, Count I, ¶¶ 24–25. However, the court will consider the Castensons' additional assertions of false statements at other points in the CDBG application process, raised in the Castensons' briefs, recognizing the possibility

that the Complaint could be construed more broadly to allege false statements elsewhere in the CDBG application process, not merely in the RROF. Furthermore, consideration of additional allegations of false statements does not change the outcome of the motions for summary judgment on this claim.

City's request for release of CDBG funds, the RROF, completed on June 29, 1996. *See* Plaintiffs' Exhibit 22.[5] This RROF includes a certification that "[t]he recipient has complied with the National Environmental Policy Act of 1969, as amended, and with the environmental procedures, permit requirements and statutory obligations of the laws cited in 24 C.F.R. § 58.5." *Id.* at Part 2, ¶ 2. The RROF also certifies that the City has complied with other HUD regulations pertinent to NEPA. *See id.* at ¶¶ 3–6. Thus, unlike the CDBG Application, the RROF includes certifications that the City *had* indeed complied with NEPA, not merely that it *would* comply. Nonetheless, the Castensons have not identified here a portion of the record that shows beyond dispute that there was a "false" certification by the City, thus entitling them to summary judgment on Count I, *see Hartnagel,* 953 F.2d at 395 (requiring the movant to identify portions of the record showing that there is no genuine issue that the movant is entitled to judgment as a matter of law), nor have they generated a genuine issue of material fact on a false certification, in an effort to defeat the defendants' motion for summary judgment, because there is no basis in the record for a contention that the City's certification of NEPA compliance in the RROF was false. *See id.* at 394 (an issue of material fact is genuine if it has a real basis in the record).

In support of this allegation of a false certification, the Castensons assert that an archaeological survey was "required" as part of the EA, either by HUD regulations or by the SHPO. However, the Castensons have failed to point to any pertinent regulation requiring an archaeological survey as part of an EA. It is true that HUD regulations for compliance with NEPA state that "[a] recipient may not commit HUD assistance funds under a program listed in § 58.1(b) [which includes the CDBG program, in § 58.1(b)(1) ] until HUD or the State has approved the recipi-

ent's RROF and the related certification of the responsible entity." 24 C.F.R. § 58.22(a). However, there is no requirement of completion of an archaeological survey as part of an EA prior to filing a RROF. Instead, with exceptions stated in 24 C.F.R. §§ 58.34 and 58.35, "the responsible entity must prepare an EA in accordance with subpart E of this part." 24 C.F.R. § 58.36 (also providing that a party may proceed directly to preparation of an environmental impact statement (EIS) if it is "obvious" even without an EA that an EIS will be required). That EA must do the following: determine existing conditions, 24 C.F.R. § 58.40(a); identify all potential environmental impacts, § 58.40(b); identify, analyze, and evaluate impacts and the significance of their effects, § 58.40(c); examine and recommend feasible ways to eliminate adverse impacts, § 58.40(d); examine alternatives to the project itself, § 58.40(e); and complete environmental review requirements, § 58.40(f). The Castensons have pointed to no "requirement" in these regulations that the City perform an archaeological survey. *Cf. Sierra Club v. United States Forest Service,* 46 F.3d 835, 839 (8th Cir. 1995) (finding no requirements in the statute or regulations for the specific analysis of impacts in the EA demanded by the plaintiffs and therefore finding the EA adequate).

Instead, it is undisputed that, at the time of the RROF, the City had evaluated the need for an archaeological survey. The City, through MIDAS and the USDA–RD, had determined that there were no sites of archaeological or historical significance known to exist in either of the alternative sites for the sewage lagoon, in compliance with 24 C.F.R. § 58.40(a) (requiring determination of existing conditions); the City therefore concluded that there were no identifiable potential environmental impacts on archaeological or historical sites, in compliance with

---

5. Again, this is the allegation of a false statement that actually appears in the Castensons'

Complaint. *See* Complaint, Count I, ¶¶ 24–25.

§ 58.40(b); the City had identified, analyzed, and evaluated impacts and the significance of their effects, in light of the SHPO's recommendation, by obtaining further information that still supported the City's conclusion that there were no known sites, and little likelihood of such sites, that would be impacted by the sewage lagoon in either location, in compliance with § 58.40(c); the City had examined and recommended feasible ways to eliminate adverse impacts, including calling in archaeological experts if any sites were discovered during construction, in compliance with § 58.40(d); the City had examined alternatives to the project itself, by considering projects other than a system involving sewage lagoons in the engineer's initial report, in compliance with § 58.40(e); and the City had completed environmental review requirements, in compliance with § 58.40(f).

Although the City's conclusion that there was no need for an archaeological survey was contrary to the recommendation of the SHPO, the SHPO had only *recommended* such a survey and was without authority to require it. *See* Plaintiffs' Exhibit 17 (based on review of the records, the SHPO made "comments and recommendations" for an archaeological survey); Plaintiffs' Exhibit 19 (reiterating the "recommendation"). On July 9, 1996, the SHPO asserted that "[b]y proceeding with the project, you will not be in compliance with Section 106 of the National Historic Preservation Act of 1966 as amended 1992," and warned that the project would be "open to possible litigation." Plaintiffs' Exhibit 23 at 2. Nevertheless, the SHPO nowhere indicated that an archaeological survey was required in the EA, only that failure to do such a survey prior to "proceeding with the project," not prior to filing a RROF, might open the City to litigation.

█ Thus, the Castensons have pointed to no evidence of a "false" certification that has a real basis in the record. *See Hartnagel,* 953 F.2d at 394 (an issue of material fact is genuine if it has a real basis in the record).[6] Because they cannot identify a portion of the record showing beyond dispute, or even generate a genuine issue of material fact, that any false or fraudulent claims have been made, summary judgment in favor of the City and the Mayor on this claim is appropriate. *Cf. Rabushka ex rel. United States,* 122 F.3d at 563 (stating the grounds for summary judgment on a claim under the FCA); *see also Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d at 1492 (same).

### D. The FONSI Notice Claim

The court therefore turns to the Castensons' second claim, their claim that their due process rights were violated when they did not receive individual notice of the June 12, 1996, FONSI, even though, they contend, they were persons "known to be interested" in the location of the sewage lagoon. Assuming, without deciding, that the Castensons can pursue such a claim,

---

6. The Castensons have relied substantially on their contention that an archaeological survey was required, but have given little attention to a companion contention that a wetlands survey was also required, but never done, as part of the MIDAS EA. To the extent that the Castensons still rely on a requirement of a wetlands survey, the court can find no authority requiring such a survey as part of an EA, and finds as well that there is no genuine issue of material fact from the record as to whether or not there was an inadequate review of potential impact on wetlands. The MIDAS EA shows that wetlands impact was at least considered and that concerns about the location of wetlands and the floodplain were investigated. Hence, the court finds that the Castensons' assertion of false statements of compliance with a requirement for a wetlands survey also has no real basis in the record. *See Hartnagel,* 953 F.2d at 394 (an issue of material fact is genuine if it has a real basis in the record).

either because they can pursue a due process claim based on a violation of NEPA via 42 U.S.C. § 1983, despite the availability of enforcement means for the NEPA under the APA—A proposition for which the court has found no authority—or because they have standing under the APA to pursue a NEPA violation, because they are within the "zone of interest" of NEPA—A proposition the court also finds doubtful—this claim depends upon a showing by the Castensons that they were indeed persons "known to be interested" in the location of the sewage lagoon and therefore entitled to receive individual notice of the June 12, 1996, FONSI. It is uncontested that the Castensons did not receive individual notice of the June 12, 1996, FONSI. Consequently, summary judgment in favor of the Castensons is appropriate if they can identify portions of the record demonstrating beyond dispute that they were such persons "known to be interested," *see Hartnagel*, 953 F.2d at 395, and summary judgment in favor of the City and the Mayor is appropriate if the Castensons cannot generate a genuine issue of material fact that they are such persons "known to be interested." FED. R.CIV.P. 56(e) (the resisting party is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325.[7] However, the court finds that the Castensons cannot do what they must, either to obtain summary judgment in their favor, or to defeat sum-

mary judgment in favor of the City and the Mayor, on this claim.

### 1. The notice requirement

The pertinent HUD regulation for compliance with NEPA states the following regarding notice of a FONSI:

> § 58.43 Dissemination and/or publication of the findings of no significant impact.
>
> (a) If the responsible entity makes a finding of no significant impact, it must prepare a FONSI notice, using the current HUD-recommended format or an equivalent format. A[t] a minimum, the responsible entity must send the FONSI notice to individuals and groups known to be interested in the activities . . . .

24 C.F.R. § 58.43(a). As the Castensons correctly state, nowhere do the applicable regulations define who is an individual or group "known to be interested" in activities.

The court has found only two decisions, neither recent, that focus on who is a person "known to be interested" in a project, such that the person is entitled to individual notice of a FONSI. The first of these decisions is *Colony Fed. Sav. & Loan Ass'n v. Harris*, 482 F.Supp. 296 (W.D.Pa.1980). In *Colony Federal*, following a catastrophic fire at a glassworks that was a major employer in Beaver County, Pennsylvania, the county pursued a project to assist the glassworks in its plan to rebuild and expand its operations, and thereby protect the county's tax and employment base, by purchasing and condemning "blighted" property around the destroyed glassworks, then reselling the

---

**7.** Again, the City and the Mayor assert other grounds for summary judgment on this claim. However, the court need not reach these other grounds, assuming that they could be dispositive in and of themselves, if the Castensons cannot establish beyond dispute or generate a genuine issue of material fact on the issue that is at the center of the claim, that they were persons "known to be interested" in the location of the sewage lagoon in June of 1996, and consequently enti-

tled to individual notice of the June 12, 1996, FONSI. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492 (same).

property to the glassworks. *See Colony Fed., Sav. & Loan Ass'n,* 482 F.Supp. at 300–01. Part of the money to fund the county's acquisition of the "blighted" properties surrounding the glassworks was obtained from HUD grants. *Id.* The county issued a FONSI, but failed to notify the plaintiff savings and loan, which had, in ignorance of the county's project, purchased property for a branch in the area to be condemned for the glassworks expansion. The savings and loan contended, in the part of the case of interest here, that it and other property owners in the area to be condemned were persons "known to be interested" in the condemnation project, but the county had failed to provide them with personal notice of the FONSI for the project, as required by former 24 C.F.R. § 58.17(b), now § 58.43(a). *Id.* at 303–04.[8] The district court concluded that "[f]ailure to notify such interested parties as the affected property owners in the area covered by the environmental analysis where they are relatively few in number and the plan contemplates condemnation of their properties is sufficient allegation of a procedural omission to require action by the federal entities as the overseers of an urban redevelopment project." *Id.* at 304.

The second case that the court has found pertinent to the question of who is a person "known to be interested" in activities covered by a FONSI is *Cornell Village Tower Condominium v. Department of Housing and Urban Dev.,* 750 F.Supp. 909 (N.D.Ill.1990). In *Cornell Village,* HUD awarded a Housing Development Grant to the City of Chicago for the development of the Park Tower Apartment building. *Cornell Village,* 750 F.Supp. at 913. The plaintiff condominium association and its members contended, in part, that the City of Chicago failed to provide them with adequate notice of its FONSI, even though

the condominium association was "an especially interested party." *Id.* at 926. The court examined the FONSI notice requirements found in 24 C.F.R. §§ 58.43 and 58.55, the successor provisions to former 24 C.F.R. § 58.16(b) and § 58.17(b) at issue in *Colony Federal. See Cornell Village,* 750 F.Supp. at 926–27. The court concluded that, "[t]o the extent that Cornell is an interested party and that HUD knew or should have known of this status, failure to provide it with specific notice constitutes procedural error." *Id.* at 927.

In *Cornell Village,* the condominium association contended that it was "at least as interested as the property owners in *Colony Federal,*" because of the proximity of the Cornell Village Tower Condominium to the Park Tower site. *Id.* The court, however, disagreed with this contention, because "the *Colony Federal* plaintiffs owned property that was to be condemned to make way for the project at issue and thus their interest was more manifest." *Id.* The court noted, however, that HUD did not contest the interest of the *Cornell Village* plaintiffs, based on their proximity to the project, instead seeking summary judgment on the ground that HUD neither knew nor should have known of their interest. *Id.* The court found no evidence in the record corroborating HUD's purported lack of knowledge, and therefore declined to grant HUD's motion for summary judgment, finding "a material fact to remain regarding the very narrow issue of whether HUD knew or should have known of Cornell's special interest (and therefore whether the failure to give personal notice constituted the sort of procedural error that should have triggered a refusal to release funds)." *Id.*

---

8. The question actually before the court in *Colony Federal* was whether failure to send notice of the FONSI to individuals "known to be interested" in the project was a sufficient procedural omission to require action by the federal entities as overseers of an urban development project. *See Colony Fed. Sav. &*

*Loan Ass'n,* 482 F.Supp. at 304. Nevertheless, the decision in that case turned in large part on the issue now before this court, which is, who is a person "known to be interested" in activities who is therefore entitled to individual notice of a FONSI. Thus, *Colony Federal* is instructive here.

### 2. Were the Castensons entitled to personal notice of the FONSI?

The Castensons contend that they were persons "known to be interested" in the sewage lagoon project, within the meaning of 24 C.F.R. § 58.43, as early as December of 1994, and therefore they were entitled to individual notice of the June 12, 1996, FONSI. They base this contention on the December 27, 1994, letter from project engineer James Merideth to the IDNR informing the IDNR that the City wanted to consider an "alternate site" west of the City. See Plaintiffs' Exhibit 13. The Castensons argue that Mr. Merideth's December 27, 1994, letter to the IDNR establishes the defendants' knowledge of their interest, because the only site west of the City that has ever been considered for the sewage lagoon is on their property. Thus, they contend, for at least eighteen months prior to promulgation of the June 12, 1996, FONSI, the City knew that the Castensons' property was under consideration as a possible location for the sewage lagoon. The record, however, shows that there is no genuine issue of material fact that the Castensons' farm was *not* known to be the site for the sewage lagoon until some time after the June 12, 1996, FONSI was promulgated, and that the Castensons were not persons "known to be interested" in the project to which the June 12, 1996, FONSI relates, because the primary location for the sewage lagoon contemplated in the EA on which that FONSI is based was *north* of the City. These conclusions are considered in more detail below.

First, the Castensons cannot establish beyond dispute, or even generate a genuine issue of material fact, that their interest in the project and entitlement to personal notice of the June 12, 1996, FONSI was "known" in December of 1994 on the basis of subsequent decisions to locate the sewage lagoon on their property. The fact that the Castensons' property was chosen as the site for the sewage lagoon, at some point in 1997, standing alone, simply fails to raise any inference that anyone knew in December of 1994 that the sewage lagoon was likely to be located on the Castensons' property.

Nor does Mr. Merideth's December 27, 1994, letter give rise to any such inference, because it identifies no specific location as the "alternate site" for the sewage lagoon; rather, it states only that "[t]he alternate site would be west of the City in an area that may allow better use of gravity flow to serve areas on the west side of the community and possibly, several commercial properties along the state highway at the northwest corner of the community." Plaintiffs' Exhibit 13. Any interest arising from a general indication of the direction from the City in which the sewage lagoon might lie, if certain "gravity flow" conditions in fact materialize there, is a far cry from the "direct" interest of the property owners in *Colony Federal*, who owned property in an area that the county's plan specifically contemplated condemning. See *Colony Fed. Sav. & Loan Ass'n*, 482 F.Supp. at 304; see also *Cornell Village*, 750 F.Supp. at 927 (describing the interest of persons who owned property that was to be condemned to make way for the project as "manifest"). In contrast, there is no indication in the record before this court that the City knew what property would be condemned for the sewage lagoon at the time of Mr. Meredith's December 27, 1994, letter to the IDNR. Furthermore, the Castensons' interest on the basis of the December 27, 1994, letter to the DNR is also more tenuous, and hence less obviously "known," than the interest of the condominium association in *Cornell Village*, whose interest arose from the physical proximity of the Cornell Village Tower Condominium to the planned project, the Park Tower site, even though condemnation of the condominium apparently was not contemplated. See *Cornell Village*, 750 F.Supp. at 927 (finding that the condominium association's interest was less "manifest" than the interest of the plaintiffs in *Colony Federal*, and noting that HUD conceded the interest of the condominium association while arguing instead its lack of knowledge of that interest).

There is no indication from Mr. Meredith's December 27, 1994, letter to the IDNR that the Castensons' property is even in "proximity" to any "alternate site" for the sewage lagoon west of the City.

Nor does Mr. Merideth's reference in the December 27, 1994, letter to an area in which gravity flow might work to the advantage of the project focus the potential site on the Castensons' property, see Plaintiffs' Exhibit 13, and hence heighten the known interest of the Castensons. Nothing in the record raises a reasonable inference that it was apparent to Mr. Merideth in 1994 (or at any time prior to the June 12, 1996, FONSI) what specific location to the west of the City might actually have the desired attribute. Thus, there is no inference from this evidence that the Castensons' property was within an area that the City's plan contemplated condemning, see Colony Fed. Sav. & Loan Ass'n, 482 F.Supp. at 304, or even that the Castensons' property was "in proximity" to property to be used for the project. See Cornell Village, 750 F.Supp. at 927. Instead, Mr. Meredith's undisputed deposition testimony is that he only concluded that a site for the sewage lagoon to the west of the City was preferable to the "North Site" based on aerial mapping, which involved the taking of aerial photographs of the area on May 30, 1996, the return of aerial maps in late July, and Mr. Meredith's own analysis of those maps over approximately the next four months. Meredith Deposition (attached to Defendants' Amended and Substituted Brief in Support of Motion To Dismiss), pp. 18–20.

■ Finally, the pertinent EA does not give rise to any inference that the Castensons had an interest in the sewage lagoon project sufficiently "manifest" to be known to the City at the time of the June 12, 1996, FONSI, and hence sufficient to entitle the Castensons to personal notice of the FONSI. First, it is undisputed that the MIDAS EA contemplated the so-called "North Site" as the primary candidate for the site of the sewage lagoon. Plaintiffs' Exhibit 37. Unlike the alternative "West Site," the "North Site" had been pinned down to a specific location, at least since the CDBG Application dated November 20, 1995. See Plaintiffs' Exhibit 3. That CDBG Application refers to a "location map" in Appendix A. Id. This "location map" shows the "North Site" for the sewage lagoon in a specific location north of U.S. Highway 175. Although the MIDAS EA, on which the FONSI in question was based, also includes a map showing the location of the City and the general location of two proposed lagoon sites, that map is to a far different scale with considerably less detail, and uses large triangles to identify the proposed lagoon sites, one to the north of the City and one to the west. See Plaintiffs' Exhibit 37(Map). In contrast to these large triangles, the area actually contemplated for the use of the sewage lagoon was only approximately 10 acres, a much smaller area than the triangles covered on the map, such that the markers are far too large to indicate specific sites for the sewage lagoon. See Plaintiffs' Exhibit 1 at 17. As the court observed in its statement of the factual background, the triangles indicating both proposed lagoon sites do not appear to be to scale and thus do not show any specific proposed "West Site" for the sewage lagoon in specific relationship to any landmarks. See Plaintiffs' Exhibit 37(Map); and compare Plaintiffs' Exhibit 3, Appendix A ("Location maps"). This indication of a proposed "West Site" as an alternative location for the sewage lagoon in the MIDAS EA does not give rise to an inference that the Castensons' property was within an area the City's plan contemplated condemning, see Colony Fed. Sav. & Loan Ass'n, 482 F.Supp. at 304, or even that the Castensons' property was "in proximity" to property to be used for the project, see Cornell Village, 750 F.Supp. at 927, such that their interest in the project should have been so apparent as to entitle them to personal notice of the FONSI.

Consequently, the court concludes that the Castensons have not identified any portion of the record showing beyond dis-

pute that they were persons "known to be interested" in the sewage lagoon project such that they were entitled to notice of the June 12, 1996, FONSI, as they must to prevail on their own motion for summary judgment on this claim. *See Hartnagel,* 953 F.2d at 395 (requiring the movant to identify portions of the record showing that there is no genuine issue that the movant is entitled to judgment as a matter of law). Nor have the Castensons generated a genuine issue of material fact that they were persons "known to be interested" in the sewage lagoon project such that they were entitled to notice of the June 12, 1996, FONSI, as they must to defeat the defendants' motion for summary judgment on this claim. FED.R.CIV.P. 56(e) (the resisting party is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. Because proof that the Castensons were persons "known to be interested" is an essential element of their claim in Count II of their Complaint—whatever the authority on which such a claim may be brought—the City and the Mayor are entitled to summary judgment on Count II. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d at 1492 (same).

### III. CONCLUSION

Although the claims asserted in this lawsuit may be plagued by other fundamental deficiencies, as asserted by the defendants, the court finds that summary judgment is appropriate on both claims on the ground that the Castensons can neither point to evidence demonstrating that certain essen-

tial elements of their claims are beyond dispute, in support of their own motion for summary judgment, nor generate a genuine issue of material fact as to those essential elements to stave off the defendants' motion for summary judgment. The Castensons' *"qui tam* claim" fails on the lack of any basis in the record for assertions of a "false statement" upon which government funds were fraudulently obtained. The Castensons' FONSI notice claim fails on the lack of any basis in the record for their assertion that they were persons known to be interested in the sewage lagoon project at the time of the June 12, 1996, FONSI. Because there are no genuine issues of material fact on these elements, and the defendants are entitled to judgment as a matter of law, the defendants' June 21, 1999, motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as amended July 12, 1999, and as converted to a motion for summary judgment on October 23, 1999, is **granted** as to both Counts I and II, and the Castensons' November 12, 1999, cross-motion for summary judgment is **denied.** **Summary judgment** on both counts shall enter in favor of the defendants and this matter is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**